*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-1132

LANDON R. MAYO, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-17614-16)

(Hon. José M. López, Trial Judge)

(Argued October 20, 2021                    Decided January 6, 2022)

*Vincent A. Jankoski* and *Sean R. Day* were on the briefs for appellant.

*Jessie K. Liu*, United States Attorney at the time the briefs were filed, *Channing D. Phillips*, then Acting United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Chrisellen R. Kolb*, *Monica Dolin*, *Jennifer Loeb*, and *Meredith E. Mayer-Dempsey*, Assistant United States Attorneys, were on the briefs for appellee.

Before EASTERLY, MCLEESE, and DEAHL, *Associate Judges*.

Opinion of the court by *Associate Judge* EASTERLY.

Dissenting opinion by *Associate Judge* MCLEESE at page 56.

EASTERLY, *Associate Judge*: Nineteen-year-old Landon Mayo was "just hanging out" with some other people in an alley in the Kenilworth neighborhood when a group of officers from the Metropolitan Police Department's Gun Recovery Unit, part of a two-car convoy, pulled up. Three GRU officers exited the vehicle and focused their attention on Mr. Mayo, who had walked away from them to talk to other people in the alley. Following and flanking him, the GRU officers told Mr. Mayo they just wanted to talk—but then asked if he had a gun. When Mr. Mayo started to run, one officer dove to tackle him. The officer got a hand on Mr. Mayo's foot and tripped him up, but Mr. Mayo managed to continue running. He was apprehended by the second car of GRU officers a short distance away and the officers subsequently recovered a gun and drugs they believed him to have discarded or handed off to others in flight.

In this appeal, Mr. Mayo argues that the GRU officers seized him in violation of the Fourth Amendment and that the gun and drugs should have been suppressed. We agree. First, we hold that Mr. Mayo was seized when the GRU officer dove to tackle him and tripped him, even though he got away. We rely on the Supreme Court's recent decision in *Torres v. Madrid*, 141 S. Ct. 989 (2021), which effectively overruled this court's decision in *Henson v. United States*, 55 A.3d 859 (D.C. 2012). Second, we hold that this seizure was unsupported by reasonable, articulable

suspicion and therefore unlawful. Third, we hold that the items of physical evidence subsequently recovered by the police from Mr. Mayo's person and in the area of the chase were fruits of this unlawful seizure that must be suppressed. Accordingly, we vacate Mr. Mayo's convictions.[1]

## I. Facts and Procedural History

## A. Suppression Hearing

The government presented one witness at the hearing on Mr. Mayo's motion to suppress, Sergeant Jose Jaquez of the GRU. Sergeant Jaquez was one of the seven GRU officers at the scene of Mr. Mayo's arrest. He dove to tackle Mr. Mayo, and got a hand on him, but he was not the officer who ultimately arrested Mr. Mayo.[2]

Sergeant Jaquez testified that, on the evening of October 26, 2016, he was riding in an unmarked car with two other GRU officers, John Wright and Michael

---

[1] Because we reverse on this basis, we need not address Mr. Mayo's argument that the subsequent seizure where Mr. Mayo was detained and formally arrested was unlawful, nor his argument that the trial court's instruction to the jury after a jury poll breakdown coerced his guilty verdict.

[2] Officer Jaquez explained there was no body-worn camera footage of the officers' encounter with Mr. Mayo because the GRU did not start wearing body-worn cameras until the following year.

Ashley, all wearing tactical vests and badges identifying them as police. The GRU officers were out looking for illegal weapons, along with four other GRU officers riding in a separate vehicle. Sergeant Jaquez testified that they were in "the Kenilworth area" in the Northeast quadrant of the District, which (in the prosecutor's words) he "kind of gestured to" on a map but did not define by specific boundaries.[3] He further testified that the GRU was "often sent to patrol that area," and that, in the preceding three years, his unit had recovered "multiple weapons, handguns, and also narcotics." When asked by the prosecutor to "estimate . . . how many guns you've recovered," Sergeant Jacquez responded "over 10 guns. It could be more[,] . . . but I feel comfortable at this time saying about 10." And when asked to compare "the number of guns that you've recovered in that area compare[d] to other areas," Sergeant Jacquez testified that this was "one of the . . . higher amounts of guns that we've recovered compared to other parts of the city."

---

[3] The government displayed the map but did not move it into evidence as an exhibit at the suppression hearing. Later at trial, the government moved several maps into evidence: "an overview image" with a "red thing [showing] an approximate area of what we are talking about," a "zoomed-in image," and an "even more zoomed-in image"—but it is unclear if any of these maps were the map used by the government at the hearing and, by the time this case was argued on appeal, the government was unable to locate the maps admitted into evidence at trial.

The car in which Sergeant Jaquez was riding pulled into an alley off of Quarles Street N.E., in between and parallel to Kenilworth Avenue and 45th Street N.E. There the GRU officers saw a group of at least five individuals "just hanging out." Still sitting in the car, Sergeant Jaquez focused on one individual, later identified as Mr. Mayo. According to Sergeant Jaquez, Mr. Mayo "immediately disengage[d] from the group" and moved "to engage with a gentleman in a wheelchair" near a dumpster in the alley.[4] While facing this other person, Mr. Mayo's back was to the officers. Sergeant Jaquez could not see Mr. Mayo's hands and observed "just motions from his back." Sergeant Jaquez demonstrated the movement he observed, which the prosecutor characterized for the record: "[J]ust as [Sergeant Jaquez] was gesturing, his back was turned to me, and you could see shoulders kind of moving up and down as though the hands were kind of in the center of a waistband." Notwithstanding that his vantage point from the police vehicle behind Mr. Mayo made it impossible for him to see what Mr. Mayo was doing with his hands, Sergeant Jaquez asserted that Mr. Mayo was "making slight adjustments with his front waistband."

---

[4] Sergeant Jaquez provided no information about the positioning or actions of the other individuals in the alley after the police pulled into the alley.

After "a few seconds," Mr. Mayo walked away from the gentleman in the wheelchair and toward another person standing further away from the officers in a walkway area off the alley leading toward 45th Street (where Sergeant Jacquez knew the other car of GRU officers were).[5] Around that time, the three GRU officers exited their car. Officers Wright and Ashley walked directly toward Mr. Mayo, while Sergeant Jaquez split off to the side and walked toward Mr. Mayo but in a path parallel to his. Sergeant Jaquez later explained at trial that he used this flanking maneuver "to prevent any escape route from going past" him if Mr. Mayo tried to run.[6]

---

[5] Sergeant Jacquez explained at the suppression hearing that "at the time when we entered the alley . . . and we encountered Mr. Mayo and the people back there, [the other car of GRU officers] were traveling on 45th Street." At trial, he again acknowledged that at the time he engaged with Mr. Mayo, he was "aware that Officer Joseph's vehicle was on 45th Street." And Officer Joseph, the driver of the other car of GRU officers driving on 45th Street, testified both that he could see Sergeant Jacquez, Officer Wright, and Officer Ashley in the alley and that "once we saw them [] stop [in the alley], that's when we stopped" on 45th Street.

[6] Pointing to this statement and other quoted statements in note 5 *supra*, our dissenting colleague devotes pages of discussion to the propriety of citing trial testimony in analyzing whether the police had reasonable, articulable suspicion to stop Mr. Mayo. *Post* at 64–68. First, the trial testimony in question is wholly consistent with Sergeant Jacquez's testimony at the suppression hearing, thus the cases to which the dissent cites, where an appellant sought to rely on trial testimony contradicting suppression testimony or revealing new grounds for suppression are inapposite. And second, as the dissent itself ultimately acknowledges, it is "reasonable for this court to treat . . . as conceded" reliance on this testimony, given that Mr. Mayo relied on trial evidence in his briefing to this court without any objection from the government. *Id.* at 67.

As the officers approached Mr. Mayo, Officer Wright called out, "Hey, we just want to talk. We just want to talk to you. Do you have any guns?" When the officers got closer, Mr. Mayo began to run from them. As he ran past Sergeant Jaquez, Sergeant Jaquez "tried to tackle him." Although Sergeant Jaquez "leaped . . . with the hope and the intent to just grab [Mr. Mayo] right there," when he "reached out" to Mr. Mayo, he only "managed to trip up one of [Mr. Mayo's] feet." (Sergeant Jacquez also described his action as a "d[i]ve to try to stop" Mr. Mayo, which explains why, when he "reached out," he touched Mr. Mayo's foot.) Mr. Mayo "kind of fell" as a result, but "put his hand down" to catch his balance and then continued running away from Sergeant Jaquez and his two GRU colleagues who had joined the chase.

Sergeant Jaquez and Officer Ashley discontinued the pursuit and stopped to investigate when they heard an object (Officer Ashley's flashlight) hit the ground. But Officer Wright kept running after Mr. Mayo. Within a short distance,[7] the GRU officers in the second car, who had been alerted to Mr. Mayo's flight on the radio,

---

[7] According to Sergeant Jaquez's testimony, Mr. Mayo appears to have run only just beyond the square block of Kenilworth Avenue, Quarles Street, 45th Street, and Douglas Street before he was stopped by the second car of GRU officers; measurements by a defense investigator indicated that the total distance of Mr. Mayo's flight was less than 700 feet.

stopped him. Meanwhile, Officer Wright recovered a loaded handgun from the purse of a woman in the area of the chase, which subsequent fingerprint examination and DNA analysis connected to Mr. Mayo. Another officer found zip lock bags containing marijuana in the bushes adjacent to Mr. Mayo's flight path. Officers searched Mr. Mayo's person and found smaller, unused bags that matched those in the bushes, as well as several hundred dollars and a large zip lock bag of marijuana.

The defense called an eyewitness, Dwayne Lane, to testify at the suppression hearing. According to Mr. Lane, he and Mr. Mayo were part of a larger group just "hanging" and "talking" in the alley when "police pulled up and harassed" them, asking, "do [you] have any guns?" Mr. Lane testified that they all answered "no," and "lift[ed] [their] jackets up [to] show[] them that [they] didn't have any guns." Mr. Lane explained that "[w]hen [the GRU] come[s] in the neighborhood, we already know what they [are] coming for, so we automatically just show our waistband, like we don't have anything." Mr. Lane testified that the group's actions did not satisfy the GRU; "they still got out [of] the car" and walked toward him and his companions, at which point everyone in the group, who had already "spread out," "just scattered," with "everybody" running away from the officers. He explained that the fact that the police continued to approach "worried" him and the others in the group: "We all were just like[,] 'we are going to take off.'" The police did not

follow Mr. Lane, however; instead they focused on and ultimately apprehended Mr. Mayo.

## B. Trial Court's Rulings

The day after the witnesses testified, the trial court announced its ruling from the bench, granting Mr. Mayo's suppression motion. The trial court found that "there [wa]s no evidence at all" that the GRU had stopped in the alley because "there was any issue with guns"; "[t]hey were not called about anybody with a gun or any shooting. They were just in their usual patrol . . . hunting for illegal guns." The court further found that when the police first saw the group that included Mr. Mayo, "they did not say there was any criminal activity afoot. They didn't see anything." The court acknowledged that Sergeant Jaquez had explained that the police "singled out [Mr. Mayo] as the one that detached from the group." But the court stated that it "tend[ed] to believe more" Mr. Lane's testimony that he and the rest of the group including Mr. Mayo "knew [the GRU]"; "understood . . . what they were coming to do"; and "started to disperse" in response to the GRU's arrival in the alley.

The court found that after Mr. Mayo walked over to the gentleman in the wheelchair, the police saw him making movements "around his groin area."[8] The court acknowledged that these movements made Sergeant Jaquez suspect that Mr. Mayo had a gun. But the court indicated that that suspicion lacked adequate foundation because (1) the police "didn't see the front" of Mr. Mayo's body, "didn't see any bulge" in his clothing, and only saw the movement "from the back," and (2) "although there was . . . talk [that this was] a crime infested area, there was no evidence of . . . drug or narcotics sales," and the evidence that the police had recovered ten guns in the area over three years was provided without meaningful context.

The court further found that Mr. Mayo did not "just run as soon as he saw the police." Instead, he only began to run after the police approached him, called out to him, and asked if he had a gun. The court noted that the police did not have reasonable, articulable suspicion to stop Mr. Mayo at that point, and Mr. Mayo did not have to talk to the police if he did not want to. Skipping over Sergeant Jaquez's dive-tackle, the court further found the government had failed to prove that the GRU officers in the second car had a lawful basis for their actions when they seized and

---

[8] We presume the court meant to say "waistband" instead of "groin"; there was no testimony that Mr. Mayo's hand movements were in his "groin area."

searched Mr. Mayo, because the government had presented no testimony from anyone who had been present who could say "how and why" these actions were taken. Based on these findings, the court concluded that the evidence recovered from Mr. Mayo's person was "the fruit of an illegal stop and [an] illegal search" and as to this evidence granted his motion to suppress.

The government immediately asked the court to reconsider. Similarly overlooking Sergeant Jaquez's dive-tackle, the government argued that under the Supreme Court's decision in *Illinois v. Wardlow*, 528 U.S. 119 (2000), Mr. Mayo's "unprovoked flight" in a "[h]igh crime area," as well as his "messing with [his] waistband," gave the GRU officers in the second car ample basis to conduct a *Terry* stop. The court declined to alter its ruling based on the government's oral motion for reconsideration. Specifically responding to the government's characterization of the location as a high-crime area, the court "invite[d] the government to point to where there is any evidence that quote/unquote this is a high crime area," reiterating that it "was not satisfied that that came out in the evidence as being a high crime area simply because they recovered 10 guns over three years and not in just that area, but in that neighborhood."

The government subsequently filed a written motion for reconsideration. In his opposition, Mr. Mayo argued that he had been seized as soon as he tried to leave the alley, when Sergeant Jaquez dove to tackle him. But the trial court, at the government's urging, rejected that argument, concluded that the government was correct that the GRU officers in the second car lawfully seized and searched Mr. Mayo, and ruled that suppression was not warranted. As a basis for its reconsidered ruling, the trial court relied on Sergeant Jaquez's initial observation of Mr. Mayo's "body" "movement[s]" before the GRU officers approached him,[9] Mr. Mayo's flight from the GRU officers, and the GRU officers' discovery of drugs and a gun in the area of the chase. The court also reconsidered its assessment of the "high crime area" evidence.

The court continued to experience "difficulty from one perspective, in terms of the evidence that came in whether to call this a high-crime area." But it explained that in "thinking or rethinking, it's not so much that it was the evidence does not show a high-crime area"; rather the salient point, the court concluded, was that "in

---

[9] The court did not revise its factual findings about what Sergeant Jaquez actually saw and continued to acknowledge that "he d[id not] see what[ was] going on in front of [Mr. Mayo's] body"; he only saw "movement of the body."

the mind of the officer we're dealing with an experience that the officer had in that area" and "[s]o a certain alertness on his part has to be understood."[10]

After a trial, a jury found Mr. Mayo guilty of an array of drug and gun offenses. Mr. Mayo timely appealed.

## II. Analysis

Mr. Mayo argues that (1) he was seized when a police officer dove to tackle him and managed to trip him; (2) this seizure was unsupported by reasonable, articulable suspicion and therefore did not constitute a valid *Terry*[11] stop; and (3) the items of physical evidence recovered by the police subsequent to this seizure must be suppressed. While we generally defer to the trial court's fact-finding and review the evidence and reasonable inferences therefrom in the light most favorable to the

---

[10] Although counsel continued to argue that the evidence that this was a high crime area was inadequate and the government's evidence did not permit an assessment of whether the GRU officers' "wariness was reasonable because we don't know the details of what would have made them wary," e.g., how, where, or when the 10 guns had been recovered, the court reiterated its reasoning that there was enough for Sergeant Jacquez to "have that wariness" because "he has recovered 10 guns in that area" and "[w]e know what area that is because the evidence shows pictures of the area and the neighborhood and the name of the neighborhood. So it's not the entire District of Columbia, but it's that particular neighborhood."

[11] *Terry v. Ohio*, 392 U.S. 1 (1968).

suppression ruling, our review of these legal issues is de novo. *See Hooks v. United States*, 208 A.3d 741, 745 (D.C. 2019). It is "this court's obligation to ensure that the trial court had a substantial basis for concluding that no constitutional violation occurred." *Robinson v. United States*, 76 A.3d 329, 335 (D.C. 2013) (internal quotation marks omitted).

## A. Whether Sergeant Jaquez seized Mr. Mayo

This court previously rejected the "argument that an unsuccessful attempt by a police officer to detain an individual [by application of physical force] constitutes a seizure" in *Henson v. United States*, 55 A.3d 859, 862, 866 (D.C. 2012). We acknowledged statements in the Supreme Court's decision in *California v. Hodari D.*, 499 U.S. 621 (1991), indicating that a defendant need not yield to an application of force to be seized. *Henson*, 55 A.3d at 864 & n.6 (quoting *Hodari D.*, 499 U.S. at 624 ("To constitute an arrest, however—the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence—the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient.")); *Hodari D.*, 499 U.S. at 626 ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.")). We concluded, however, that

this language (1) pertained to "the historical, common law definition of seizure," not a seizure for Fourth Amendment purposes, and (2) was dicta in any event because *Hodari D.* only concerned a failure to yield to an officer's show of authority. *Henson*, 55 A.3d at 864–66. Accordingly, we held in *Henson* "that an individual is seized within the meaning of the Fourth Amendment only when he or she is within the officer's control or yields to the officer's show of authority or application of force." *Id*. at 870.

The government relied on *Henson* in its initial brief to this court to argue that Mr. Mayo was not seized by Sergeant Jacquez. But after the parties submitted their briefs, the Supreme Court granted certiorari in *Torres v. Madrid*, 141 S. Ct. 989 (2021). The question presented in *Torres* was whether "an unsuccessful attempt to detain a suspect by use of physical force [is] a 'seizure' within the meaning of the Fourth Amendment . . . or [whether] physical force [must] be successful in detaining a suspect to constitute a 'seizure.'" Pet. for a Writ of Cert. at i, *Torres v. Madrid*, No. 19-292, 2019 WL 4203519. Because this case and *Torres* "raise[d] the same Fourth Amendment seizure issue," the government moved to hold this appeal in abeyance pending a decision in *Torres*. We granted the government's motion.

In its decision in *Torres*, the Supreme Court effectively overruled *Henson's* holding regarding what constitutes a seizure. Relying on *Hodari D.*, the Court rejected the distinction drawn in *Henson* between common law arrests and seizures for the purposes of the Fourth Amendment, and squarely decided that because "the common law considered the application of force to the body of a person with intent to restrain to be an arrest, no matter whether the arrestee escaped," the same was true under the Fourth Amendment. *Torres*, 141 S. Ct. at 995. Furthermore, the court explained that because under the common law a "mere[ ]touch" was "sufficient to constitute an arrest," *id.* at 996–97, so too under the Fourth Amendment, the "slightest" contact could suffice. *Id.* But the Court stressed that the use of force must be accompanied by the "objectively manifested . . . intent to restrain," *id.* at 999, and that "[a]ccidental force will not qualify" as a Fourth Amendment seizure. *Id.* at 998. In short, the Court held "that the application of [any] physical force to the body of a person with intent to restrain is a seizure [within the meaning of the Fourth Amendment] even if the person does not submit and is not subdued." *Id.* at 1003.

After the Supreme Court issued its decision in *Torres* we asked the parties to file supplemental briefs addressing "whether and how . . . *Torres* affects our consideration of Mr. Mayo's case." *See* Order dated March 26, 2021. We now hold, pursuant to *Torres*, that Sergeant Jaquez seized Mr. Mayo when he dove to tackle

him. Sergeant Jaquez's contact with Mr. Mayo, causing Mr. Mayo to trip and "kind of" fall, plainly amounted to an application of force to Mr. Mayo's body. And this application of physical force objectively manifested an intent to restrain. Indeed, the record evidence provides no support for an argument that Sergeant Jaquez's contact with Mr. Mayo was accidental; rather the only reasonable understanding of Sergeant Jaquez's purpose in "tackling," "leaping" toward, or "diving" at Mr. Mayo is that Sergeant Jaquez was attempting to prevent Mr. Mayo from running away by restraining him.

The trial court did not assess the constitutionality of this seizure because it did not recognize it as such. Nonetheless the government argues in its supplemental brief that we may affirm the denial of Mr. Mayo's suppression motion on other grounds, namely because Sergeant Jaquez's seizure was supported by reasonable, articulable suspicion. Discerning no procedural unfairness, particularly in light of the parties' supplemental briefing at this court's direction, we address this argument.

## B. Whether Sergeant Jaquez had reasonable, articulable suspicion to seize Mr. Mayo

"[A] police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries." *Robinson v. United States*, 76 A.3d 329, 335 (D.C. 2013) (quoting the companion case to *Terry*, *Sibron v. New York*, 392 U.S. 40, 64 (1968)); *see also Brown v. United States*, 590 A.2d 1008, 1013 (D.C. 1991) (whether in their homes or out in public, individuals in the District have a Fourth Amendment right generally "to be left alone" by the police (internal quotation marks omitted)). Under the Fourth Amendment the police must have either probable cause to arrest an individual for a crime or at least reasonable, articulable suspicion that an individual is engaged in criminal conduct to effect the "lesser intrusion" of a "brief[]" *Terry* "stop" to investigate whether that is in fact the case. *Brown*, 590 A.2d at 1013. Thus, "[e]ven a brief restraining stop of a person [by the police] is an unreasonable seizure in violation of the Fourth Amendment if it is conducted for investigatory purposes without a reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity." *Golden v. United States*, 248 A.3d 925, 933 (D.C. 2021) (internal quotation marks omitted).

To determine if a *Terry* stop was supported by reasonable, articulable suspicion a court must examine whether the totality of "the facts available to the officer at the moment of the seizure . . . 'warrant a [police officer] of reasonable caution in the belief' that [the stop] was appropriate." *Robinson*, 76 A.3d at 336 (quoting *Terry*, 392 U.S. at 21–22); *accord Miles v. United States*, 181 A.3d 633, 643 n.16 (D.C. 2016) (explaining we examine reasonable, articulable suspicion "from the standpoint of an objectively reasonable police officer") (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "Multiple factors may contribute to the totality of the circumstances, including the time of day, flight, the high crime nature of the location, furtive hand movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and viewing of an object or bulge indicating a weapon." *Posey v. United States*, 201 A.3d 1198, 1201–02 (D.C. 2019) (internal quotation marks omitted). The reasonable, articulable suspicion standard obviously requires a lesser showing than probable cause and "is not onerous, but it is not toothless either." *Robinson*, 76 A.3d at 336 (internal quotation marks and citation omitted). "An officer's 'inchoate and unparticularized suspicion or hunch of criminal activity'" will not suffice. *Pleasant-Bey v. United States*, 988 A.2d 496, 500 (D.C. 2010) (quoting *Wardlow*, 528 U.S. at 123–24). Nor will a "subjective good faith" belief in the propriety of a stop. *Pridgen v. United States*, 134 A.3d 297, 301 (D.C. 2016). Lastly, although we engage in a totality of the

circumstances analysis, Fourth Amendment protections cannot be overcome without individual examination of each circumstance the government relies on as contributing to reasonable, articulable suspicion. *In re D.A.D.*, 763 A.2d 1152, 1155 (D.C. 2000) ("To determine whether there was reasonable suspicion to stop [appellant], we evaluate each factor individually and then as a whole to determine whether the combination of facts establishes the grounds for articulable suspicion."). Through the enforcement of the reasonable, articulable suspicion standard, courts ensure that the "narrow" scope of the exception created by *Terry* to the Fourth Amendment requirement that an arrest be supported by probable cause is not unduly expanded. *Robinson*, 76 A.3d at 335 (quoting *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979)).

Examining the totality of the circumstances that the government argues was known to the police before Sergeant Jacquez dove at Mr. Mayo[12]—specifically, (1) their initial observations of Mr. Mayo's presence in a group in an alley, his

---

[12] It is well-settled that "the end result can *never* justify the constitutionality of the circumstances leading to a seizure of evidence." *Powell v. United States*, 649 A.2d 1082, 1083 (D.C. 1994); *see also Brown*, 590 A.2d at 1013 ("A search [or seizure] is not to be made legal by what it turns up; it is good or bad when it starts and does not change character from its success, or from evidence discovered subsequent to the arrest." (citation omitted)).

separation from the group, and his interactions with two other individuals; (2) their observation of his flight after they exited their vehicle, approached him, and asked him if he had a gun; and (3) their previous seizures of guns in that area—we conclude their seizure of Mr. Mayo was not supported by reasonable, articulable suspicion and was unlawful.

### 1.    The GRU Officers' Initial Observations of Mr. Mayo

This street encounter began when Sergeant Jaquez and his fellow GRU officers decided to pull their vehicle into an alley and approach a group of individuals who, according to Sergeant Jaquez, were "just hanging out."  The officers were not responding to any tip or report of a crime in the area; they were simply "on patrol" looking for illegal weapons, the recovery of which is the "main goal" of the unit, *Pridgen*, 134 A.3d at 299 n.1.  There is no evidence they observed any member of the group engaged in criminal or even suspicious activity.  Rather, the GRU officers appear to have initiated the encounter with the group that included Mr. Mayo because they were a group of individuals who could be asked if they possessed guns.[13]  *See Posey*, 201 A.3d at 1203 (in concluding police lacked

---

[13] One of the "simple technique[s]" the GRU employs is to confront people on the street and ask them point blank if they have a gun. *Robinson*, 76 A.3d at 331–

justification to conduct *Terry* stop, assigning significance to their lack of observation of "any illegal activity or any indicia of illegal activity as [they] approached the group of men that included [the appellant]").

Thereafter, the GRU Officers focused on Mr. Mayo, allegedly because he "disengaged" or walked away from one cluster of individuals and toward other individuals nearby. But the trial court credited testimony from Mr. Lane, another member of the group in the alley, that this conduct was not distinguishing. Mr. Lane testified that when the GRU officers pulled into the alley, he and his companions "automatically" lifted their jackets to show the officers they were not carrying a weapon and "spread out." They "knew" the GRU, they understood what the GRU were there for, and they were seeking to stave off further interaction. The trial court explained that "there [wa]s nothing to put any doubt on the testimony of Mr. Lane that all of those guys in that group understood what that vehicle was and what they were coming to do" and thus it "tend[ed] to believe more" that all the individuals in the group had "started to disperse" when the GRU officers arrived, as Mr. Lane

32 (noting GRU officer's testimony that they "ask[] people if they have a gun" and then "look[] for a reaction," including people's "movements" in response to the question (brackets and internal quotation marks omitted)); *see also, e.g.*, *Hawkins v. United States*, 248 A.3d 125, 127 (D.C. 2021); *Golden*, 248 A.3d at 931–33; *Pridgen*, 134 A.3d at 299.

testified, rather than that Mr. Mayo alone had separated from the group, as Sergeant Jaquez testified. Given our previously stated recognition that "an individual's 'attempt to exercise his right not to participate in an encounter' with police officers does not 'constitute the kind of conduct on the scene that could significantly bolster the government's showing of articulable suspicion,'" *Bennett v. United States*, 26 A.3d 745, 753 (D.C. 2011) (ellipsis omitted) (quoting *Brown*, 590 A.2d at 1019–20), the collective dispersal in response to the GRU's arrival provided little support for the officers' decision to seize Mr. Mayo, *see In re T.L.L*, 729 A.2d 334, 340–42 (D.C. 1999) (holding appellant's seizure was unsupported by reasonable, articulable suspicion, where in response to the arrival of police at the scene who were investigating a vague lookout, the appellant and "entire group of young men"—"the innocent as well as the possibly guilty"—"tr[ied] to make themselves scarce" by running into an apartment).[14]

The GRU officers also focused on what they perceived to be Mr. Mayo's hand movements while interacting with the gentleman in the wheelchair, the first man he

---

[14] The trial court did not make a specific finding that it credited Mr. Lane's jacket-lifting testimony and our analysis does not turn on this particular fact. But if the GRU officers actually had had reason to believe that the men were not armed, that would weigh against the government in a reasonable, articulable suspicion analysis.

approached after he allegedly split off from the people he had been talking to when the police pulled into the alley. According to Sergeant Jaquez, Mr. Mayo was "making slight adjustments with his front waistband," which might have provided some basis for suspecting Mr. Mayo had a weapon in that location. But the evidence did not establish that Sergeant Jaquez actually saw Mr. Mayo's hands touch his waistband—at the time Sergeant Jaquez made this observation, he and his fellow GRU officers were still in the police car and Mr. Mayo was standing some distance away with his back to them. As the prosecutor documented after Sergeant Jaquez's in-court demonstration of Mr. Mayo's movements, all the officers could see were shoulder shrugs which made it seem like Mr. Mayo's hands were moving somewhere in front of him near the waistband level. The trial court made a specific finding that the GRU officers "didn't see the front" of Mr. Mayo's body and only saw movement in Mr. Mayo's "groin area"[15] "from the back." [16]

---

[15] *But see supra* note 8.

[16] In a footnote in its brief, the government highlights Officer Wright's testimony at trial that, after the police drove into the alley, Mr. Mayo "immediately disengage[d] from the group" and appeared to adjust something at his waistband before he approached the man in the wheelchair and then "appeared to move his jacket up" as though he were "going to hand something to the gentleman in the wheelchair." We have previously recognized our ability to consider undisputed trial testimony in assessing whether the trial court erred in ruling on a motion to suppress. *See Miles v. United States*, 181 A.3d 633, 643 n.17 (D.C. 2018); *see e.g.*, note 6 *supra*; *accord post* at 66. But Officer Wright's testimony *was* disputed, by Sergeant Jaquez. Both at the suppression hearing and at trial, Sergeant Jaquez testified that

Mr. Mayo's gestures are "capable of too many innocent explanations," to provide much if any support for a reasonable, articulable suspicion that Mr. Mayo was armed or otherwise engaged in criminal activity. *Duhart v. United States*, 589 A.2d 895, 899 (D.C. 1991) (internal quotation marks omitted). This court has repeatedly held that hand movements that have been directly observed and are consistent with mundane behavior do not meaningfully contribute to reasonable, articulable suspicion. For example, in *Duhart*, this court rejected the government's argument that an officer's observation, in a high narcotics trafficking area, of the appellant and another individual "examining 'something'" and the appellant's subsequent act of "shov[ing] an item into his pocket" after seeing the police officer furnished reasonable, articulable suspicion for a seizure. *Id.* at 898–900; *see also id.* at 899 ("There is nothing 'unusual' or even mildly 'suspicious' about such activity, which must occur as a matter of course between individuals every day, and there are innumerable innocent explanations for such behavior."). And in *In re A.S.*, 827 A.2d 46 (D.C. 2003), this court concluded that the appellant's "stuffing motion with his

---

Mr. Mayo separated from the group, "immediately" walked over to the man in the wheelchair, and only then made hand movements at his waistband level while his back was to the GRU officers, making it impossible to see either his hands or the front side of his body. We note Officer Wright's credibility was also generally impeached with the fact that a trial court had "refused to credit" at least part of his testimony in a prior Superior Court case. Accordingly, we decline to consider Officer Wright's trial testimony.

right hand into [his] waistband area" was susceptible to too many perfectly innocent explanations (including "tucking in his shirt, scratching his side, pulling up his pants, arranging his underwear, pager, cell phone, or walkman, etc.") to provide reasonable, articulable suspicion to justify a seizure, even in a high-crime area around midnight. *Id.* at 47–48; *see also In re D.J.*, 532 A.2d 138, 142–43 (D.C. 1987) (*modified on other grounds by Allison v. United States*, 623 A.2d 590 (D.C. 1993)) (rejecting government's argument that appellant's act of "putting his hands in his pockets" "raised sufficient cause for suspicion to justify a *Terry* stop"); *cf. Morgan v. United States*, 121 A.3d 1235, 1237–38 (D.C. 2015) (officers had reasonable, articulable suspicion to conduct *Terry* stop based on report from citizen who saw appellant "'reach[] into the back of his pants and pull[] something out and put it back in' during the exchange of small objects with another man," because there was "no plausible, innocent explanation for such conduct" (brackets omitted)). Because here the GRU officers could not actually observe Mr. Mayo's hands, the innocuous possibilities multiply and the value of these movements in constructing reasonable, articulable suspicion correspondingly diminishes.[17]

---

[17] Given his limited observation, Sergeant Jaquez' trial testimony that he "believed" Mr. Mayo might have been trying to "pass [a gun] off" to someone else is speculative and irrelevant. *See Parsons v. United States*, 15 A.3d 276, 280 (D.C. 2011) ("A court may not simply rely on a police officer's conclusory assertions in deciding whether a search or seizure was justified under the Fourth Amendment, but

The GRU officers' observations of Mr. Mayo's actions before he fled from them do not provide any appreciable support for the government's argument that they had a lawful basis to stop him.

### 2. Provoked Flight

As a basis to seize Mr. Mayo, the government also directs us to Mr. Mayo's flight from the GRU officers after they exited their vehicle, approached him, and called out to him, asking if he had a gun. Of course, "[o]fficers with minimal information are permitted to approach people to investigate their hunches," *Posey*, 201 A.3d at 1202, and "a defendant's flight [from the police] can be a relevant factor in the reasonable suspicion analysis," *Miles*, 181 A.3d at 641. But as we have previously explained and once more reaffirm, "flight cannot imply consciousness of guilt in all cases." *Id.* (quoting *Duhart v. United States*, 589 A.2d 895, 900 (D.C. 1991) (quoting *Smith v. United States*, 558 A.2d 312, 316 (D.C. 1989) (en banc)).

Any assessment of the import of flight cannot ignore the foundational Fourth Amendment principle that "approached individuals are free to refuse to speak with

rather must evaluate the facts underlying those assertions." (internal quotation marks omitted)).

officers or avoid them altogether." *Posey*, 201 A.3d at 1202; *see also Dozier v. United States*, 220 A.3d 933, 943 (D.C. 2019) ("[J]ust as police are at liberty . . . to ask questions, so the person approached by police has 'an equal right to ignore his interrogator and walk away.'" (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980))). Thus officers who seek to engage with an individual based on a mere hunch but are rebuffed "must then continue to establish facts . . . and build on their hunches by other means." *Posey*, 201 A.3d at 1202. "To say that a citizen is free to leave without responding to the officer's questions is meaningless if the exercise of that freedom generates authority for a seizure where none previously existed." *Brown*, 590 A.2d at 1019 (citation omitted). "Departure from an imminent intrusion cannot bootstrap an illegal detention into one that is legal." *Id.* (cleaned up).

To be sure, flight is a pronounced form of avoidance. *Wardlow*, 528 U.S. at 124 ("headlong flight is the consummate act of evasion. It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). But even so, flight is not an automatic tally mark in the reasonable, articulable suspicion column. Although some of our cases may appear to categorize a defendant's flight as categorical evidence of consciousness of guilt, our court has long recognized that "leaving a scene hastily may be inspired by innocent fear or by a legitimate desire to avoid contact with the police." *Smith*, 558 A.2d at 316. That real world

recognition has only been reinforced in recent years. The current national conversation about policing and public safety at the very least lays bare "the reality that not all encounters with the police proceed from the same footing but are based on experiences and expectations." *Dozier*, 220 A.3d at 944–45. There are many reasons an innocent person, particularly an innocent person in a highly policed community of color, might run from the police: "an individual may be motivated to avoid the police by a natural fear or dislike of authority, a distaste for police officers based upon past experience, a[] . . . fear of police brutality or harassment, a fear of being apprehended as the guilty party, or other legitimate personal reasons." *Miles*, 181 A.3d at 641 (internal quotation marks and brackets omitted). The "myriad reasons" an individual like Mr. Mayo[18] "might run away from the police" undermine

---

[18] The record reflects that Mr. Mayo is Black. *See Dozier*, 220 A.3d at 944–45 & n.13–16 (recognizing that "fear of harm . . . at the hands of police" "is particularly justified for persons of color, who are more likely to be subjected to [hyper-vigilant] police surveillance," and that appellant "reasonably could have feared that unless he complied with the police requests [to conduct a pat-down], he would be vulnerable to police violence"); *Miles*, 181 A.3d at 641–42 & n.14 (noting the existence of a growing body of research, as well as the documentation and publication of instances of police violence nationwide, indicating that fear of police brutality is not "exaggerated"); *Pridgen,* 134 A.3d at 303 n.17 (quoting *Wardlow*, 528 U.S. at 132 (Stevens, J., concurring in part and dissenting in part)) ("Among some citizens, particularly minorities and those residing in high crime areas, there is . . . the possibility that the fleeing person . . . believes that contact with the police itself can be dangerous . . . .").

the reasonableness of an inference of criminal activity from all instances of flight. *Id.*

In short, "[f]light is not merely a box that, once checked, automatically justifies a stop." *Posey*, 201 A.3d at 1204. Instead flight must be assessed "in the context of the specific facts and corroborating circumstances of each individual case," *id.*, to determine if one can reasonably infer that the individual "is attempting to flee from a crime," *Brown*, 590 A.2d at 1020 (internal quotation marks omitted); *accord Miles*, 181 A.3d 640–45 (conducting such a fact-specific and contextual analysis). This is entirely consistent with the Supreme Court's discussion of flight in *Wardlow* and its pronouncement that "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." 528 U.S. at 125.

The Supreme Court indicated in *Wardlow* that an important consideration in assessing the import of a defendant's flight is whether it was "unprovoked." 528 U.S. at 124–25; *accord District of Columbia v. Wesby*, 138 S. Ct. 577, 587 (2018) (internal quotation omitted) ("Unprovoked flight upon noticing the police, we have explained, is certainly suggestive of wrongdoing and can be treated as suspicious behavior that factors into the totality of the circumstances."). At issue in *Wardlow*

was the legality of a stop of an individual who was in "an area known for heavy narcotics trafficking," "holding an opaque bag," and ran upon seeing a police caravan drive by. *Id*. at 121–22 (the defendant "looked in the direction of the officers and fled"). Defending this stop, the State of Illinois as the petitioner argued that the defendant's "unprovoked flight at the mere sight of police" alone justified a *Terry* stop and pressed the Supreme Court to adopt a bright line rule to that effect. Petitioner's Br. at 5, 13, *Illinois v. Wardlow*, No. 98-1036, 1999 WL 451857. The Court rejected this argument sub silentio, concluding instead that the defendant's "unprovoked [headlong] flight upon noticing the police" was one circumstance (along with contextual locational information, *see infra* Section II.B.3) that contributed to the officers' reasonable, articulable suspicion to conduct a *Terry* stop. *Id.* at 124–25. In keeping with *Wardlow*, our court has similarly held that where an individual, without any interaction and on nothing more than sight, flees from police, such conduct supports (but does not alone justify) a lawful *Terry* stop. *See, e.g., Wilson v. United States*, 802 A.2d 367, 370–71 (D.C. 2002).[19]

---

[19] In *Wilson*, this court, relying on *Wardlow*, concluded that two police officers on foot in plain clothes who "merely looked" at the appellant and his friend and "started toward them" did not act in such a way as to provoke his "hurried" effort to get away from the police, which included his "frantic[] pound[ing] on an apartment door, in a manner the police reasonably did not perceive as being 'about the business' of requesting admittance by a relative or friend," so as to overcome the consciousness of guilt implications of these actions. In tension with his acknowledgement that "the degree to which flight contributes to reasonable

This is not to say that flight that is to some degree "provoked," i.e., generated by something more than the passive presence of the police, has no value in the reasonable, articulable suspicion calculus. The point is that the provocation must be acknowledged and factored into the totality of the circumstances analysis to ensure both that a defendant's behavior is being reasonably assessed as evidence of consciousness of guilt, and that the police are not incentivized to generate reasonable, articulable suspicion where there is none.[20] We examine Mr. Mayo's flight accordingly.

---

suspicion depends on context," *post* at 70, our dissenting colleague argues that *Wilson* compels a similar assessment of Mr. Mayo's flight. *Post* at 63. But he both disregards the obvious factual differences between that case and this one. And he oversells *Wilson* as definitively interpreting *Wardlow* as imposing a formalistic, flight-plus-high-crime-area test for reasonable, articulable suspicion—check both boxes and the *Terry* stop is legit. Our decision in this case is consistent with precedent, both from this court and the Supreme Court, reaffirming post-*Wardlow* "the fact intensive and context-dependent nature of the reasonable suspicion analysis." *Miles*, 181 A.3d at 641 (citing *Navarette v. California*, 572 U.S. 393 (2014); *Missouri v. McNeely*, 569 U.S. 141, 158 (2013); *United States v. Arvizu*, 534 U.S. 266, 277 (2002)); *see also In re D.A.D.*, 763 A.2d 1152, 1155–56 (D.C. 2000) (examining flight and location of where police were responding to reports of shooting, in conjunction with other facts, in assessing reasonable, articulable suspicion under a totality of the circumstances analysis post-*Wardlow*, pre-*Wilson*).

[20] While *Henson* concluded that the act of grabbing a person without reasonable, articulable suspicion did not amount to provocation by the police, its reasoning stemmed from the mistaken premise that grabbing a person is not a seizure if they manage to get away. *Torres* has now negated that premise, so that *Henson*'s subsequent pronouncement as to what counts as provocation has no residual force. Taken on its terms, *Henson* suggested that only excessive force by the police may be considered in an analysis of whether flight is provoked. 55 A.3d 868–70. But

Unlike the defendant in *Wardlow* who took one look at police officers driving by and ran, Mr. Mayo took flight only after Sergeant Jaquez and his two GRU colleagues took a series of actions that indicated they had Mr. Mayo in their sights: they drove their vehicle into the alley where Mr. Mayo was hanging out with his companions, stopped, and exited the vehicle wearing tactical gear; they singled Mr. Mayo out from the rest of the group and began to follow him as he walked down a pathway off the alley toward the location where the officers knew another car of GRU officers to be, with two officers directly behind Mr. Mayo and another taking a parallel path in a flanking maneuver; and they called out as they closed in on him, "Hey, we just want to talk. We just want to talk to you. Do you have any guns?"

The GRU officers' actions—cutting off Mr. Mayo's movement in the pathway off the alley, approaching him from multiple angles thereby preventing Mr. Mayo from avoiding them—makes this case much like *Miles*, where we concluded that the

---

that view is irreconcilable with a central concern of the reasonable, articulable suspicion inquiry: to discern whether a defendant's behavior reasonably indicates a guilty mind—not whether a defendant reasonably believes he had a right to act in self-defense. We have previously rejected *Henson*'s approach to provocation as inconsistent with binding precedent, *see Miles*, 181 A.3d at 644 n.18 (discussing *Henson* and explaining that "it would be a mistake to focus entirely on the propriety of the police officers' conduct" when evaluating provocation, "given that the key question is whether the defendant's flight is probative of his or her participation in criminal activity"), and we reaffirm that rejection here.

police provoked appellant's flight by following him on foot from behind, then cutting off his path with a police car from the front, and asking (effectively ordering) him to stop. *Miles*, 181 A.3d at 636, 643–44. We explained that, regardless of their legality or propriety, the officers' actions "would be startling and possibly frightening to many reasonable people," demonstrating "a reason other than consciousness of guilt for [appellant] to have fled." *Id*. at 644 & n.18; *see also Dozier*, 220 A.3d at 942 (identifying the manner in which the armed police officers positioned themselves as they engaged with the appellant in an alley, including by "park[ing] the patrol car at the entrance to the alley" and "walking closer to appellant as they called out to him," as one factor that made the police encounter with appellant "particularly intimidating"). Unlike *Miles*, the GRU officers did not in so many words direct Mr. Mayo to stop. But we do not think this single fact mitigates the coercive nature of their actions. The officers had no need to issue such a directive if they thought they had orchestrated the encounter such that Mr. Mayo had nowhere to go.

Moreover, we cannot ignore what the officers did say. Singling Mr. Mayo out from the rest of the group, they asked if he had a gun. We examined similar behavior by the GRU, in *Golden v. United States*: the officers targeted a young man on the

street and asked, in a "conversational" tone, if "he had any weapons on him."[21] 248 A.3d at 932. We explained that "[i]t would be a mistake to view the [GRU officers' 'do you have a gun'] inquiry as equivalent to a simple request for information that an officer might put to an ordinary civilian who is not a suspect but merely may be helpful in an investigation." *Id.* at 937. Recognizing that it is illegal to carry a gun in the District without proper licensure and registration,[22] we elaborated:

> With this question, the officer gave [the appellant] reason to understand that a group of police officers in unmarked cars had singled him out and partially surrounded him because they suspected *him* of being armed and committing a crime at that very moment. [The appellant] (and any reasonable innocent person in his position) could not know what grounds the police had to suspect this, what else the police suspected about him, or how dangerous the police officers deemed him to be.

*Id.*; *accord Dozier*, 220 A.3d at 938, 941 (explaining that, where police in tactical gear single out one person and ask "hey, man, can I talk to you?" and then ask if the person is armed, it would be reasonable for the targeted individual "to feel vulnerable

---

[21] We acknowledge *Golden* is not factually on all fours with this case. In *Golden* two GRU vehicles pulled to the curb near appellant, although only one officer exited the police cars and engaged directly with the appellant, *id*. at 932; here, the second GRU vehicle was on 45th Street but all three officers exited the first vehicle and followed Mr. Mayo, with Sergeant Jaquez using a flanking maneuver described above. Recognizing the limits of case matching, *see Miles*, 181 A.3d 642 n.15, we conclude these distinctions are immaterial for the purpose of our analysis.

[22] *See* D.C. Code § 22-4504(a) (2021 Supp.); § 7-2502.01(a) (2018 Repl.).

and apprehensive" because such "questioning is at least implicitly accusatory (if not explicitly so)" (brackets and internal quotation marks omitted)). Given that "repeated or insistent (and implicitly accusatory) questions or requests designed to ferret out whether someone stopped on the street is in possession of weapons or contraband, particularly in conjunction with other intimidating or coercive circumstances," could convey a message to a reasonable person that they were not free to leave, 248 A.3d at 935–36, it is no logical leap to conclude that the same police conduct could also provoke a reasonable person, particularly someone who lives in a neighborhood where the GRU "often" patrol, to flee. *See supra* note 18. As the court asked in *Golden*, 248 A.3d at 945–46, "[w]ho among us would not have been uneasy if a squad of police suddenly appeared, partially surrounded us on a street at night, and began interrogating us as a criminal suspect?"

As the totality of these facts demonstrates, the GRU officers communicated to Mr. Mayo that they suspected him (albeit without sufficient basis, *see supra* Section II.B.1) of criminal activity, and were targeting him for investigation or worse. Under these circumstances, the officers could not reasonably perceive Mr. Mayo's flight as unprovoked or think it objectively reflected consciousness of guilt; rather it is equally if not more consistent with the "apprehensiveness that would naturally be felt" by a person, particularly a young Black person, in his situation.

*Dozier*, 220 A.3d at 942;[23] *see also Pridgen*, 134 A.3d at 299, 303 & n.17 (recognizing that the actions of GRU officers who pulled up behind appellant late at night, shined a flashlight on him, and called out, "[H]ey, do you got a gun[,]" "may provide a basis for fear of harm that has nothing to do with whether the suspect is engaged in criminal activity" and according no significance to the fact of defendant's flight as a consequence).[24]

For these reasons, we conclude that Mr. Mayo's flight contributes little to any reasonable, articulable suspicion that he was engaged in criminal activity.

---

[23] In *Dozier*, we observed that a reasonable person (in particular a Black or brown person) might submit to this show of authority out of fear that an attempt to "ignor[e] [the] police presence[] or refus[e] to answer police questions . . . might lead to detention and, possibly, more aggressive police action." 220 A.3d at 944. This fear came true in Mr. Mayo's case: Sergeant Jaquez responded to Mr. Mayo's attempt to not to engage with the police by dive-tackling him.

[24] In *Pridgen*, instead of considering the fact of flight as evidentiary support for reasonable, articulable suspicion, this court "focus[ed] entirely on what appellant did as he ran," including "pressing his palm against his outer left jacket pocket." 134 A.3d at 303 (internal quotation marks omitted)); *accord Miles*, 181 A.3d at 644 (noting that "there was nothing about the character of [appellant's] flight that seemed particularly incriminating"). But here, Mr. Mayo did not do anything after he began to run and before he was seized by Sergeant Jaquez to indicate that he was engaged in criminal activity.

### 3. High Crime Area

The government also argues we should give significant weight to the fact that Mr. Mayo fled from the GRU officers in "a high-crime area, particularly as it pertains to firearms." The government relies on Sergeant Jaquez's testimony about recovering guns in the "Kenilworth area," even though the trial court indicated that this testimony did not permit an objective assessment of this designation.

There is no question that locational evidence about criminal activity can be a relevant consideration in a *Terry* analysis. In *Wardlow*, the Supreme Court affirmed the use of locational evidence to put conduct observed by the police—in that case, the unprovoked headlong flight the Court declined to hold was per se sufficient basis to conduct a *Terry* stop, in context. 528 U.S. at 124-25. But to provide meaningful context, "high crime area" evidence must be sufficiently particularized and objectively substantiated. *Wardlow* did not define what it meant by the term "high crime area," *see Dozier*, 220 A.3d at 943 n.12. As noted above, *supra* at Section II.B.2., the central issue in *Wardlow* was whether unprovoked flight alone could be the basis of reasonable, articulable suspicion, or whether more was needed. The Court determined more *was* required, but it said little else than that, along with unprovoked flight, "the relevant characteristics of a location" could contribute to the

reasonable, articulable suspicion analysis. Instead the Court took as a given that the police had encountered Mr. Wardlow in "an area of heavy narcotics trafficking"—the Court appeared to envision that the police were responding to a specific location functioning as an open air drug market, where buyers and sellers of drugs would be seen on the street[25]—and thus said nothing about what would or would not suffice as evidence to support that designation.

Our court, however, has repeatedly signaled that vague or conclusory testimony is unhelpful and will not provide material support for the lawfulness of a *Terry* stop. The general concept of a "high crime area" had been floating around the Supreme Court's and our jurisprudence for decades prior to *Wardlow*. *See*, *e.g.*, *Dozier*, 220 A.3d at 943 n.12 (discussing the term's origin in Supreme Court jurisprudence); *Curtis v. United States*, 349 A.2d 469, 472 (D.C. 1975). And although our court acknowledged that the character of the area where a stop occurred could be a relevant consideration "in determining the reasonableness of the officer's

---

[25] The Court explained that the officers who conducted the *Terry* stop in *Wardlow* were "converging on an area known for heavy narcotics trafficking in order to investigate drug transactions," "anticipated encountering a large number of people in the area including drug customers and individuals serving as lookouts" saw Mr. Wardlow, who was "holding an opaque bag," look at them and run, and "*in this context*, . . . decided to investigate." *Id*. at 122, 124 (emphasis added); *see also Miles*, 181 A.3d at 640 (discussing "the totality of the circumstances in *Wardlow*").

suspicion," *Smith*, 558 A.2d at 316, we also warned against reliance on the phrase as a "talismanic litany," *Curtis*, 349 A.2d at 472 (rejecting argument that officers had sufficient justification to stop appellant, who made a "furtive gesture" as he turned away from the police, simply because it "happen[ed] to have occurred in a high crime area"); *see also Smith*, 558 A.2d at 316 ("[I]t is necessary to remind *again* that thousands of citizens live and go about their legitimate day-to-day activities in areas which surface in court testimony[] as being high-crime neighborhoods. The fact that the events here at issue took place at or near an allegedly 'high narcotics activity' area does not objectively lend any sinister connotation to facts that are innocent on their face." (ellipsis and internal quotation marks omitted) (emphasis added)).

Since *Wardlow* our court has favorably referenced "high crime area" evidence in a number of cases in which the basis for a *Terry* stop has been challenged. But to the extent we appear to have endorsed vague or conclusory testimony to support this designation in the context of a broader assessment of reasonable, articulable suspicion, we have done so only in the apparent absence of any debate that the designation was ill-founded or overweighted.[26] By contrast, in cases in which we

---

[26] *See, e.g.*, *Newman v United States*, 258 A.3d 162, 165 (D.C. 2021) (explaining that defendant's argument that reasonable, articulable suspicion was

have actually focused on the import of and foundation for this designation, we have continued to "caution[] against over-reliance on this amorphous term to support reasonable, articulable suspicion to effect a seizure." *Dozier*, 220 A.3d at 943 n.12; *see also Robinson*, 76 A.3d at 340 ("[R]eliance on the character of the streets . . . is not the same as the particularized, individualized suspicion that is required under *Terry*. Certainly it does not authorize officers to rove troubled neighborhoods and briefly detain and patdown anyone they encounter." (citation and internal quotation marks omitted)); *cf. Shelton v. United States*, 929 A.2d 420, 426–27 (D.C. 2007) (explaining that where the government sought to rely "on the fact that the place

---

based only on his "flight and furtive gestures," failed to account for testimony (and thus did not challenge) that the neighborhood "w[as] known for a lot of gun violence and drugs"); *Pridgen*, 134 A.3d at 299 n.1 (noting that an officer had described the area of the stop as "one of our better areas for catching people with guns" but giving no indication that the designation of the area as "high gun" had been subject to challenge at trial or on appeal); *Henson*, 55 A.3d at 868 (identifying as a factor supporting reasonable, articulable suspicion testimony that the stop occurred in "'one of the higher crime areas' in the police district" but indicating that the defendant only challenged the import of his flight as evidence of consciousness of guilt); *James v. United States*, 829 A.2d 964, 964–966 (D.C. 2003) (acknowledging testimony that the area of the traffic stop was "high crime, violent crime, . . . high narcotics, . . . high everything," but indicating that the sole argument on appeal related to reasonable, articulable suspicion was whether the defendant's act of bending down in an apparent effort to put something under the driver's seat gave the police a basis to search that area); *Cousart v. United States*, 618 A.2d 96, 97, 100 (D.C. 1992) (en banc) (noting that the stop occurred in "high drug area" but explaining that the issue on appeal was "not over the lawfulness of the police stop of the auto, which appellant concedes, but the constitutionality of the police command to appellant and the other passenger to raise their hands into view").

where the suspected transaction took place was a 'high drug area,'" to establish probable cause "that fact must be shown with sufficient particularity to justify such reliance").

Our abiding concern is that "residents of certain neighborhoods in the District of Columbia may be more likely to be suspected of engaging in criminal activity simply because of where they live or frequent." *Dozier*, 220 A.3d at 943 n.12. Thus while we reaffirm that a "high crime area" designation may be a "relevant contextual consideration[] in a *Terry* analysis," *Wardlow*, 528 U.S. at 124, we reject its use as a talismanic litany to give police expanded powers under *Terry*. Rather, just as with any other evidence that contributes to the reasonable, articulable suspicion analysis, courts must apply a "fact-intensive" approach to high crime evidence.[27] *Miles*, 181 A.3d at 641.

---

[27] The dissent mischaracterizes our reaffirmation of this approach as the "announce[ment] [of] a rigid new rule," *post* at 77, and asserts "the high-crime-area evidence in *Wardlow* would flunk the rule" we purportedly adopt, *post* at 79. First, our opinion speaks for itself. Second, as previously explained, *Wardlow* contains no discussion of what is required of high crime area *evidence*. And third, it is beyond question that reasonable, articulable suspicion must be based on more than conclusory statements. *See Terry*, 392 U.S. at 27 (reasonable, articulable suspicion may not be based on "an inchoate and unparticularized suspicion or hunch"); *Singleton v. United States*, 998 A.2d 295, 301 (D.C. 2010) ("To be 'articulable' there must be specific evidence—not merely conclusions—that led the officer to suspect criminal activity in a particular circumstance.").

We signaled that a more robust examination of high crime evidence was required in our recent decision in *Maye v. United States*, (D.C. 2021). Noting that "the officers' testimony about this being a high-crime area was short on specifics," we explained in *Maye* that "[w]e would need a great deal more than what the government offers here for the location of the encounter" to provide helpful context for a reasonable, articulable suspicion analysis. *Id*. at 647 (internal quotation omitted). We now elaborate.

Where reliance on locational information to support reasonable, articulable suspicion is contested, conclusory testimony from law enforcement officers that an area is "high crime" should be accorded little value. *Singleton*, 998 A.2d at 300–01 (rejecting reliance on conclusory statements in a reasonable, articulable suspicion analysis); *accord Golden*, 248 A.3d at 941. Instead, courts should calibrate the weight given to high crime area testimony according to the detail provided, taking into account, for example, whether geographic boundaries are precisely drawn, whether verifiable data (not just anecdotal reports) for the time period of the stop is provided, and whether there is a nexus between the documented criminal activity in the area and the police's observations. In other words, before giving weight to contested high crime area testimony, courts should demand sufficient information to support a determination both that, at the time of the stop, it would have been

reasonable to perceive a specific location as an area where a specific type of crime might occur and that that reasonable perception connects to the police officers' observation of the individual whose detention the government seeks to justify. Only with such information is judicial review of reasonable, articulable suspicion based in part on the "high crime" nature of the location meaningful. *See Terry*, 392 U.S. at 21 (explaining that reasonable, articulable suspicion "becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances").[28]

Here, we conclude that the trial court rightly declined to find that Sergeant Jaquez's testimony had much if any value as a high-crime area evidence.[29] The court

---

[28] We explain only how "high crime" evidence should be weighed within an assessment of reasonable, articulable suspicion; contrary to the assertion of the dissent, *post* at 81, nothing we say has any bearing on the quantum of the government's burden of proof at a suppression hearing.

[29] In granting the government's motion for reconsideration, the court overcame the "difficulty" it had with Sergeant Jacquez's testimony by concluding that it did not matter whether it was objectively true that Mr. Mayo was seized in a high crime area; what mattered was that it was a high crime area "in the mind of the officer." But the law is the exact opposite. Reasonable, articulable suspicion is an

determined that this testimony was lacking in specificity and too conclusory, and with good reason. Sergeant Jaquez provided no geographic boundaries of alleged high crime related to "narcotics" and guns other than to say it occurred "in the Kenilworth area." Although he apparently gestured to a map, that map was not introduced into evidence, *see supra* note 3, and the trial court's finding that he had identified "a particular neighborhood" of unknown boundaries, not "the entire District of Columbia," *see supra* note 10, is hardly support for particularized suspicion. Sergeant Jaquez provided no detail whatsoever regarding the nature or quantity of the referenced drug activity.[30] Similarly, he gave no detail about how guns had been detected and recovered in the neighborhood—he did not even confirm that these guns had been recovered during street (or alley) encounters, as opposed to

---

objective standard and an individual officer's subjective assessment of the situation does not control. *Robinson*, 76 A.3d at 331, 336–37 & n.13.

We cannot agree with the court's rationale that, based on Sergeant Jaquez's subjective assessment of the neighborhood, a "certain alertness on his part has to be understood" because it would invite police to view otherwise innocent actions through an unjustified lens of criminality. *See Robinson*, 76 A.3d at 339 (explaining GRU officer's mission to recover guns "may have clouded his perception . . . [and] made him overly ready and willing to seize and search" the appellant based on a perception that the appellant's movements were "indicative of criminality" that was not objectively reasonable (internal quotation marks omitted)).

[30] At trial, Officer Wright asserted that the whole "neighborhood" was "an open air drug market." The government does not seek to rely on this testimony; even if it had, our analysis would not change. As we have explained, such unparticularized and overly broad testimony is simply unhelpful in assessing reasonable, articulable suspicion.

one or more home raids conducted with a warrant. All he did was "estimate" that "over 10 guns" had been recovered in "the Kenilworth area" in a three-year time period; and he provided no hard data to back up this assertion. Such testimony is less specific locationally and only marginally more specific quantitatively than the testimony we found lacking in *Maye*. *See* 260 A.3d at 641–42 (officers testified that over the course of five or more years they had confronted multiple individuals with guns or drugs on a specific block). But even assuming the 10 guns Sergeant Jacquez referenced were recovered from individual street seizures, the fact that an average of three to four guns have been recovered per year in an undefined geographic area without a basis of comparison (other than Sergeant Jaquez's vague assertion that this number was "one of the . . . higher amounts of guns [the GRU had] recovered compared to other parts of the city") adds little to the contextual consideration of location in the reasonable, articulable suspicion analysis.

In sum, although more particularized, detailed, and data-based locational information about criminal activity might have put Mr. Mayo's innocuous conduct in a different light or made his provoked flight more indicative of consciousness of guilt, the testimony the government presented did not provide meaningful context for the GRU officer's observations of Mr. Mayo before they seized him.

\*             \*             \*

We conclude that (1) Mr. Mayo's ambiguous movements, observed by GRU officers positioned some distance behind him, (2) his initial provoked flight from three GRU officers, and (3) his presence in an area of undefined size where, over a period of three years, ten or so guns had been recovered by the GRU, did not, either singly or in combination, give the GRU officers reasonable, articulable suspicion to seize Mr. Mayo. At most the GRU officers had an inchoate and unparticularized hunch that he was carrying a weapon. Because that is an insufficient basis for a *Terry* stop, Sergeant Jaquez's seizure of Mr. Mayo was unlawful and violated his rights under the Fourth Amendment.

## C. Whether the Evidence Should Be Suppressed

Having determined that the seizure of Mr. Mayo was unlawful, we must determine whether suppression of evidence recovered subsequent to that seizure—the drugs found on Mr. Mayo's person as well as the gun and drugs he apparently discarded or handed off to another person after Sergeant Jaquez seized him and he

pulled away—must be suppressed pursuant to the exclusionary rule.[31] "It has long been the law that evidence collected in violation of the Fourth Amendment is considered 'fruit of the poisonous tree' and generally may not be used by the government to prove a defendant's guilt." *United States v. Bumphus*, 227 A.3d 559, 569 (D.C. 2020) (internal quotation marks omitted); *accord Johnson v. United States*, 253 A.3d 1050, 1056 (D.C. 2021). The exclusionary rule is "recognized as a principal mode of discouraging lawless police conduct. . . . [W]ithout it the constitutional guarantee against unreasonable searches and seizures would be a mere 'form of words.'" *Terry*, 392 U.S. at 12 (quoting *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)). "The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). "Once a defendant makes a sufficient prima facie showing of illegality and a causal connection to the alleged fruit, the government bears the burden to prove that suppression of physical or other evidence pursuant to the exclusionary rule is not

---

[31] Mr. Mayo only moved to suppress the evidence obtained from the search of his person before the trial court. But the trial court appeared to rule not only on the admissibility of that evidence but also the evidence he allegedly discarded before his arrest. On appeal he argues all of this evidence should have been suppressed. Because the government has not raised a preservation challenge and has fully briefed this issue with respect to all of the evidence, *see Carrell v. United States*, 165 A.3d 314, 325 n.30 (D.C. 2017) (en banc), we conclude any preservation issue has been waived.

warranted. *Crews v. United States*, 389 A.2d 277, 289 (D.C. 1978) (en banc), *rev'd on other grounds*, 445 U.S. 463 (1980) (acknowledging "the burden of producing evidence that will bring the case within one or more exceptions to the exclusionary rule rests squarely upon the prosecution."); *see also Johnson*, 253 A.3d at 1056 ("[the] exclusionary rule applies unless the government proves" that it does not).[32]

In its supplemental brief to this court, the government argues both that: (1) Mr. Mayo failed to carry his burden to establish a causal connection between Sergeant Jaquez's illegal seizure and the recovery of the evidence discarded in his subsequent flight and found on his person after he was re-seized, and (2) the recovery

---

[32] In its initial brief, the government argued that Mr. Mayo abandoned the items he discarded when he fled from the GRU officers after Sergeant Jaquez dove at him, and therefore lacked standing to challenge the recovery of those items on Fourth Amendment grounds. *See Spriggs v. United States*, 618 A.2d 701, 703 n.3 (D.C. 1992). This argument does not survive our conclusion that Sergeant Jaquez's dive to tackle Mr. Mayo was an illegal seizure, *see supra* Section II.A, which compels the attenuation analysis detailed above and cannot be evaded by a resort to a standing challenge. *See Dozier*, 220 A.3d at 947 n.20 (rejecting argument that exclusionary rule did not apply based on abandonment where "the undisputed evidence [showed] appellant discarded the drugs he had been safeguarding in his sock within a minute or two after he broke free from the unlawful seizure just as he was about to be caught by the officers who were chasing him").

of this evidence was sufficiently attenuated from Sergeant Jaquez' illegal conduct.

Neither argument is persuasive.[33]

### 1.  Whether the Seizure Was a But-For Cause of the Discovery of the Evidence

The government's argument that Mr. Mayo failed to carry his burden to prove but-for causation appears to misunderstand what is required of Mr. Mayo qualitatively and quantitatively.  As noted above, he need only make a "prima facie showing of illegality and a causal connection to the alleged fruit" in order to shift the burden to the government to prove that the exclusionary rule should not apply. *Crews*, 389 A.2d at 289.  A prima facie showing of causation is easily satisfied in a case where, as here, there is a linear sequence of (1) an illegal seizure by the police, (2) flight by the defendant accompanied by a discarding of contraband, and (3) recovery of the discarded contraband and the additional contraband from a search of defendant's person by the police who pursued and re-seized the defendant.  *See*

---

[33] The dissent appears to argue that we should remand for the trial court to make a factual finding about but-for causation. *Post* at 83.  But the government invites us to examine the facts on the record, asserting they are legally insufficient to support a determination of but-for cause.  For the reasons discussed, we conclude that the evidence amply supports a showing of but-for cause and it would be incorrect as a matter of law for a trial court, on this record, to rule otherwise.

*United States v. Brodie*, 742 F.3d 1058, 1060, 1063 (D.C. Cir. 2014) (reversing the trial court's ruling denying suppression and concluding, based on the same sequence of events, that "[t]he presence of but-for causation [wa]s quite plain").

The government asserts *Brodie* is distinguishable because the method of illegal seizure (there, by submission to a show of authority, *id.* at 1061) was different, and because Mr. Mayo was seeking to avoid the GRU officers before Sergeant Jaquez illegally seized him. But for the purposes of this prima facie showing, the precise variety of illegality is irrelevant; the only question is whether the illegal conduct and the recovery of evidence sought to be suppressed can be linked by a causal chain, *see id.* at 1062–63. Likewise, Mr. Mayo's pre-seizure flight from the police does not thwart but-for causation. The government appears to argue that, because Mr. Mayo had decided to flee before the police seized him, must also have decided to discard the contraband before the seizure. But not only is there no evidence of such a decision on this record, it is illogical to infer that someone who the police had confronted but not yet attempted to seize would form a plan to discard contraband in close proximity to the police where it could be easily recovered and used to implicate him in criminal activity. The far more logical inference is that Mr. Mayo only decided after Sergeant Jacquez attempted his dive-tackle that he had better quickly rid himself of the contraband subsequently recovered by the police,

based on the recognition that the GRU officers would do their best not to let him get away and would attempt to re-seize him.

The cases relied on by the government do not support its challenge to Mr. Mayo's showing of but-for causation because the court in those cases either (1) determined there was no illegal search or seizure prior to the defendant's discarding of contraband which would serve as the but-for cause of the discovery of evidence,[34] or (2) implicitly recognized that the defendant had made a prima facie showing of causation, explained that a showing of but-for cause alone is insufficient to compel suppression,[35] and then analyzed attenuation.[36]

---

[34] *See United States v. McClendon*, 713 F.3d 1211, 1217 (9th Cir. 2013) (concluding appellant "was not seized until after he tossed his gun" "and thus lost his ability to challenge the admissibility of the [abandoned] handgun as a fruit of an illegal seizure"); *United States v. Morgan*, 936 F.2d 1561, 1570–71 (10th Cir. 1991) (holding appellant "abandoned his right to object to the search of the bag" when he threw it off the side of a porch prior to his lawful arrest and subsequent to his valid detention).

[35] *See Wong Sun*, 371 U.S. at 488 (rejecting the argument that but-for causation is a sufficient basis for suppression and explaining that courts must also assess whether "the evidence to which [the] instant objection is made has been come at by exploitation of [illegal police conduct] or instead by means sufficiently distinguishable to be purged of the primary taint" (internal quotation marks omitted)).

[36] *See United States v. Boone*, 62 F.3d 323, 325–26 (10th Cir. 1995) (concluding officers' recovery of the evidence that appellants threw out the window of their car was "sufficiently attenuated" from the officers' initial illegal car search by "the presence of intervening circumstances"); *United States v. Garcia*, 516 F.2d

We conclude that Mr. Mayo carried his burden to show but-for cause.

### 2. Whether the Discovery of Evidence Was Sufficiently Attenuated From the Illegal Seizure

This leaves the government's attenuation argument. Evidence obtained as the product of an unlawful search or seizure must be suppressed "unless the government proves that the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstances so as to remove the taint imposed upon that evidence by the original illegality." *Johnson*, 253 A.3d at 1056 (internal quotation marks omitted); *see also Robinson*, 76 A3d at 342 n.27 (acknowledging "it is the government's burden to prove attenuation"). In conducting an attenuation analysis we consider: (1) "the temporal proximity between the unconstitutional conduct and the discovery of evidence," (2) "the presence of intervening circumstances," and (3) "the purpose and flagrancy of the official misconduct." *Utah v. Strieff*, 579 U.S.

---

318, 319–20 (9th Cir. 1975) (explaining that "a 'but-for' connection [between "illegal police conduct" and "the suspect's act"] alone is insufficient," and then analyzing attenuation); *People v. Henderson*, 989 N.E.2d 192, 201–05 (Ill. 2013) (recognizing that appellant's flight, during which he dropped a gun, was responsive to officers' illegal seizure, but noting that "[b]ut-for causality is only a necessary, not a sufficient, condition for suppression," and then proceeding to analyze attenuation (internal quotation marks omitted)).

232, 239 (d2016) (internal quotation marks omitted); *accord Johnson*, 253 A.3d at 1057.

The close temporal proximity of the unlawful seizure to Mr. Mayo's discarding of evidence, his arrest, and the recovery of the evidence by the police from his person and his flight path "strongly favors" suppression. *Johnson*, 253 A.3d at 1057 (holding that where police recovered evidence within "mere moments" of an unlawful patdown "the temporal proximity factor strongly favor[ed] appellant"). The government does not contend otherwise. Although Sergeant Jaquez never testified exactly how much time elapsed between his effort to tackle Mr. Mayo and the recovery of the evidence from Mr. Mayo's person and the surrounding area, given the short distance Mr. Mayo fled before being re-seized, it is clear that all these events occurred in a short timeframe.

The absence of intervening circumstances between Sergeant Jaquez's illegal seizure of Mr. Mayo and the recovery of the evidence also weighs in favor of suppression. Mr. Mayo's post-illegal-seizure flight on foot in a manner that "posed no incremental threat to anyone," *Johnson*, 253 A.3d at 1057–58 (quoting *Brodie*, 742 F.3d at 1063 (D.C. Cir. 2014)), and his discarding of evidence during that flight

are not "independent, intervening event[s] that purged the taint of the unlawful seizure," *Dozier*, 220 A.3d at 947 n.20.[37]

Third and finally, the purpose of the GRU officer's unlawful seizure of Mr. Mayo supports application of the exclusionary rule. We examine whether the seizure was "investigatory in design . . . and executed in the hope that something might turn up." *Johnson*, 253 A.3d at 1059 (citing *Brown v. Illinois*, 422 U.S. 590, 605 (1975)).[38] The evidence establishes that it was. The GRU officers were out "patrolling . . . [for] guns," using their regular technique of confronting people they encounter on the street and asking them point blank if they have a weapon.[39] *See*

_____

[37] In *Johnson*, we acknowledged that in some cases, a number of which the government cites here, *see supra* notes 34 & 36, other courts "have found attenuation in a defendant's response to illegal police conduct," 253 A.3d at 1057, for example when a defendant "had either committed a new crime or had fled in a manner posing serious risks to the public safety—typically a vehicular flight leading to a high-speed car chase," *id*. No such circumstances are present here.

[38] *See, e.g.*, *Jones v. United States*, 168 A.3d 703, 723 (D.C. 2017) (suppression of cell phones warranted where "undoubtedly one of the officers' purposes in [unlawfully] deploying [a] cell-site simulator . . . to locate and track phones" was the recovery of cell phones (emphasis omitted)); *Gordon v. United States*, 120 A.3d 73, 86 (D.C. 2015) (suppression of evidence warranted where "the officer's purpose at the time of the [unlawful] seizure [was] to check [appellant's] identity through computer databases that include information about warrant status").

[39] To the extent the GRU uses this intimidating tactic to gin up responses that they can then use to justify investigative seizures of the people they accost, *see id.*, their investigative methods are troubling, but even without considering whether such conduct is the sort of flagrant misconduct that needs to be deterred, we conclude that the government cannot carry its burden to prove attenuation.

*Pridgen*, 134 A.3d at 299 n.1; *supra* note 13. The GRU officers' investigative purpose coupled with their illegal seizure of Mr. Mayo weighs in favor of suppression.

Considering the trio of attenuation factors altogether, we conclude that the government failed to carry its burden to demonstrate that the recovery of the physical evidence from Mr. Mayo's person and his flight path was purged of the taint of the initial unlawful seizure. Accordingly, suppression of this evidence was warranted.

### III. Conclusion

For the reasons set forth above, we hold that Mr. Mayo was illegally seized and the physical evidence obtained by the police from his person and in the area of his flight should have been suppressed. Accordingly, we vacate Mr. Mayo's convictions and remand for further proceedings consistent with this opinion.

*So ordered.*

MCLEESE, *Associate Judge*, dissenting: I agree with the court that Mr. Mayo was seized for purposes of the Fourth Amendment when Sergeant Jaquez tripped

Mr. Mayo. *Supra* at 14-17. I disagree, however, with the court's holding that the police lacked reasonable suspicion to stop Mr. Mayo. *Supra* at 18-47. I therefore respectfully dissent.

**I.**

"When reviewing a trial court's denial of a motion to suppress, we view the evidence in the light most favorable to the prevailing party. We draw all reasonable inferences in favor of upholding the trial court's ruling. We review the trial court's legal conclusions de novo." *United States v. Lewis*, 147 A.3d 236, 239 (D.C. 2016) (en banc) (citations and internal quotation marks omitted).

"The police may briefly detain a person for an investigatory or *Terry* stop if the officers have a reasonable suspicion based on specific and articulable facts that criminal activity may be occurring." *Morgan v. United States*, 121 A.3d 1235, 1237 (D.C. 2015) (ellipses and internal quotation marks omitted). "The reasonable, articulable suspicion standard requires substantially less than probable cause and considerably less than proof of wrongdoing by a preponderance of the evidence. It is not onerous, but it is not toothless either. . . . Unparticularized suspicion and inarticulate hunches are not sufficient to sustain a *Terry* stop . . . ." *Robinson v.*

*United States*, 76 A.3d 329, 336 (D.C. 2013) (citations and internal quotation marks omitted). In sum, a lawful investigative detention requires "some minimal level of objective justification." *Immigr. & Naturalization Serv. v. Delgado*, 466 U.S. 210, 217 (1984).

"In determining whether this reasonable suspicion standard has been met, a court must consider the totality of the circumstances, as viewed through the lens of a reasonable police officer, guided by [the officer's] training and experience." *United States v. Taylor*, 49 A.3d 818, 824-25 (D.C. 2012) (citations and internal quotation marks omitted). "[W]e do not examine each factor in isolation from the others . . . ." *Hampleton v. United States*, 10 A.3d 137, 143 (D.C. 2010) (brackets and internal quotation marks omitted). "Even if each specific act . . . could be perceived in isolation as an innocent act, the observing police officer may see a combination of facts that make out an articulable suspicion." *Id.*

## II.

Viewed in the light most favorable to the trial court's ruling, the pertinent evidence at the suppression hearing was as follows. Police officers in an unmarked cruiser pulled into an alley in the Kenilworth neighborhood. The officers worked in

the Gun Recovery Unit (GRU), which often patrolled in that area. In the preceding three years, the GRU had recovered narcotics and ten or more guns from the area. That was "one of the . . . higher amounts," compared to other areas of the city.

One of the officers, Sergeant Jaquez, focused on Mr. Mayo, who had been standing with a group of other individuals. Mr. Mayo walked over to a man in a wheelchair. Mr. Mayo was facing away from Sergeant Jaquez, who therefore could not see Mr. Mayo's hands. Sergeant Jaquez saw Mr. Mayo's shoulders moving up and down, and he believed that Mr. Mayo was making adjustments in the area of his front waistband.

After a few seconds, Mr. Mayo left the man in the wheelchair, walking away from the police and toward another person who was in a walkway near the alley. Three GRU officers got out of the cruiser and began walking towards Mr. Mayo. One of them said to Mr. Mayo, "Hey, we just want to talk. We just want to talk to you. Do you have any guns?" Mr. Mayo then began to run, at which point Sergeant Jaquez tripped him. Mr. Mayo continued to flee, but he was later apprehended by other officers.

After initially granting Mr. Mayo's motion to suppress, the trial court granted reconsideration and denied the motion. The trial court concluded that Mr. Mayo was not seized until he was apprehended by other officers. The trial court also ruled that the other officers had reasonable suspicion to stop Mr. Mayo. On the latter point, the trial court relied on, among other things, (1) Mr. Mayo's movements while standing near the man in the wheelchair; (2) the evidence that the GRU had recovered ten guns from the area; and (3) Mr. Mayo's flight after being asked if he had a gun.

## III.

The grounds for reasonable suspicion in this case seem at least as strong as the grounds for such suspicion in *Wilson v. United States*, 802 A.2d 367 (D.C. 2002). In that case, two detectives in plain clothes went into a block described as having "a high level of narcotics activity." *Id.* at 368. They saw two men, one of whom was Mr. Wilson, walking toward an apartment building. *Id.* The two men looked at one of the detectives and then quickened their pace. *Id.* The detective walked toward the men, who entered the building at a hurried pace. *Id.* Other police officers happened to be in the building for unrelated reasons, and one of them saw Mr. Wilson and his companion being followed by the two detectives. *Id.* Mr. Wilson

and his companion hurried around a corner, after which the officers heard frantic banging on a door. *Id.* When the officers turned the corner, they saw Mr. Wilson and his companion. *Id.* Mr. Wilson's companion appeared agitated. *Id.* Officers detained both of them. *Id.*

On appeal, Mr. Wilson argued that the police lacked reasonable suspicion to stop him. *Wilson*, 802 A.2d at 369. This court disagreed. *Id.* at 369-72. The court interpreted the Supreme Court's decision in *Illinois v. Wardlow*, 528 U.S. 119 (2000), to hold that unprovoked flight from police in a high-crime area suffices to establish reasonable suspicion. 802 A.2d at 370-71. The court acknowledged that Mr. Wilson had not engaged in headlong flight. *Id.* at 370. The court concluded, however, that Mr. Wilson's quick walking and frantic knocking constituted suspicious and evasive behavior. *Id.* at 370. The court also concluded that Mr. Wilson's evasive behavior was unprovoked, because the detectives had merely looked at Mr. Wilson and started walking toward him before Mr. Wilson moved quickly into the building. *Id.* at 371.

This case is not identical to *Wilson*. The high-crime-area evidence in *Wilson* was more geographically precise (one block as opposed to a neighborhood) and less quantitatively precise ("high" as opposed to a number of recovered guns and a

comparison to other areas). This case involves headlong flight, which the Supreme Court has described as "the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow*, 528 U.S. at 124; *see also, e.g. District of Columbia v. Wesby*, 138 S. Ct. 577, 587 (2018) ("In fact, deliberately furtive actions and flight at the approach of law officers are *strong indicia* of *mens rea*.") (ellipses and internal quotation marks omitted). The evasive behavior in *Wilson* seems quite a bit weaker. Mr. Mayo's flight could reasonably be viewed with greater suspicion than the evasive behavior in *Wilson* for another reason, because Mr. Mayo's flight followed the officer's asking whether Mr. Mayo had a gun. *See, e.g.*, *Copeland v. State*, 443 S.E.2d 869, 871 (Ga. Ct. App. 1994) (relying on fact that suspect fled "in response to the question concerning a weapon"); *see generally, e.g.*, *Posey v. United States*, 201 A.3d 1198, 1202 (D.C. 2019) (circumstances to be considered in determining whether police officers have reasonable suspicion include suspect's "reaction to questioning") (internal quotation marks omitted).

On the question whether the evasive behavior at issue was unprovoked, this case adds the circumstance that the police indicated that they wanted to speak with Mr. Mayo and asked him whether he had a gun. Finally, in this case, Sergeant Jaquez had seen Mr. Mayo's hand motions near his waistband. I agree with the court that

those hand motions were sufficiently ambiguous that, by themselves, they would not have added substantially to reasonable suspicion. *Supra* at 23-27. We do not view each circumstance in isolation, though, and in my view the trial court properly gave some weight to those movements in assessing whether the totality of the circumstances gave rise to reasonable suspicion. *Cf. generally, e.g., Plummer v. United States*, 983 A.2d 323, 333-34 (D.C. 2009) (noting that hand movements toward waist "instilled safety concerns in the officers" because, among other things, waist is "common place" to keep handgun).

Although there are differences between this case and *Wilson*, those differences cut in varying directions, and in my view the grounds for the stop in the present case were at least as strong as the grounds for the stop in *Wilson*. I therefore would affirm the trial court's denial of Mr. Mayo's motion to suppress.

## IV.

I respectfully disagree with the court's reasoning in a number of factual and legal respects.

### A. Factual Issues.

### 1. Consideration of trial evidence.

The court repeatedly relies on evidence that was introduced at trial to undermine the trial court's pretrial suppression ruling. *Supra* at 6 & n.5, 33-34. Although the parties have not presented this issue for decision, I note that, in my view, this court ordinarily should not consider evidence introduced at trial to undermine a trial court's pretrial ruling on a motion to suppress. Generally, "[o]n appeal, we must evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by hindsight." *Comford v. United States*, 947 A.2d 1181, 1189 (D.C. 2008) (internal quotation marks omitted).

> Where the judge has denied a defendant's prayer for relief during an earlier stage of a trial, and where the circumstances have changed as the case has progressed, a defendant must renew [the] request on the basis of the

> changed circumstances in order to preserve for appeal any contention based on the record as modified.

*Id.* (brackets and internal quotation marks omitted).

We have long applied that principle in the context of pretrial motions to suppress evidence. *See, e.g.*, *Hampleton*, 10 A.3d at 139 n.4 ("Because Mr. Hampleton did not move for reconsideration of the suppression motion at trial, he may not rely on later trial testimony to challenge the trial court's ruling."); *Otts v. United States*, 952 A.2d 156, 167 (D.C. 2008) ("Ordinarily, a pretrial ruling is the law of the case and cannot be revisited at trial . . . . [W]hen new grounds for suppression surface at trial, the defendant may seek to reopen the matter. However, we have held that a defendant's failure to revisit this issue at trial may preclude appellate relief, even if [the] claims have merit.") (citation and internal quotation mark omitted); *United States v. Allen*, 337 A.2d 512, 513 (D.C. 1975) ("We have previously held that, under D.C. Code [§] 23-104(a)(2) [(1973)], when a pretrial motion has been heard and decided, this then becomes the law of the case and only if there are new grounds, which include new facts which the defendant could not reasonably have been aware of[,] may a trial judge entertain a renewed motion to suppress.") (internal quotation marks omitted); *see also United States v. Hicks*, 978 F.2d 722, 724 (D.C. Cir. 1992) ("An appellate court should not rely on evidence first

produced at trial to reverse a pre-trial denial of a suppression motion not renewed at trial.").

In some circumstances, we permit appellees to rely on trial evidence "in support of the trial court's ruling" on a pretrial suppression motion. *Patton v. United States*, 633 A.2d 800, 818 n.11 (D.C. 1993); *see also Wade v. United States*, 173 A.3d 87, 92 (D.C. 2017) "(Ordinarily, we review a trial court ruling based on the evidence that was before the trial court at the time the trial court ruled. It is permissible, however, for this court to rely on undisputed trial evidence to affirm the trial court's ruling on a suppression motion.") (citation omitted). The rationale for this doctrine is that "[i]t would be wasteful to remand so that the [trial] court could reconsider its denial of a suppression motion in light of trial evidence the reviewing court believes supports the denial." *Hicks*, 978 F.2d at 725. "The situation is different when evidence presented only at trial casts doubt on what would otherwise be a correct pre-trial denial of a suppression motion." *Id.* "Trial courts are not generally bound to act *sua sponte*. The burden should not be on the court constantly to compare the evidence at trial with that from the earlier hearing." *Id.*

Mr. Mayo did not seek reconsideration of the trial court's pretrial suppression ruling based on the trial evidence. Under the foregoing principles, this court

ordinarily should not rely on trial evidence to undermine the trial court's ruling. In several recent cases, however, this court has relied on trial evidence to undermine the trial court's suppression ruling, even though the defendant had not moved for reconsideration based on the trial evidence. *E.g.*, *Miles v. United States*, 181 A.3d 633, 643 n.17 (D.C. 2018). Those cases rely on general (and in my view overbroad) language in some of our cases, and they do not address the prior binding authority to the contrary. This court therefore is bound by the holdings of our earlier decisions rather than our more recent decisions. *See, e.g.*, *Gan v. Van Buren St. Methodist Church*, 224 A.3d 1205, 1210 (D.C. 2020) ("Where a division of this court fails to adhere to earlier controlling authority, we are required to follow the earlier decision rather than the later one.") (internal quotation marks omitted).

The court relies on trial testimony about where a second police car was located and that one of the officers who approached Mr. Mayo moved to the side of the other two officers, hoping to prevent Mr. Mayo from fleeing past the officers. *Id.* at 6 & n.5, 33-34. In my view, such evidence ordinarily should not be considered as a basis to overturn the trial court's ruling. The United States has not raised this issue, however, even though Mr. Mayo relied on trial evidence in his briefing in this court. It thus would be reasonable for this court to treat the issue as conceded for purposes

of this case. I flag the issue, however, because in an appropriate case the court will need to resolve the inconsistency in its opinions.

## 2. Viewing the record in the light most favorable to the trial court's ruling.

As previously noted, we must view the evidence in the light most favorable to the trial court's ruling. *Lewis*, 147 A.3d at 239. In my view, the opinion for the court fails to do that. For example, the court describes the officers as "orchestrat[ing] the encounter so that Mr. Mayo had nowhere to go" and "cutting off" Mr. Mayo's movements. *Supra* at 33-34. The trial court made no such findings, and the evidence at the suppression hearing does not support this description. Rather, the evidence at the suppression hearing indicated only that three officers in tactical vests got out of an unmarked cruiser, walked toward Mr. Mayo (one somewhat to the side of the other two), indicated that they wanted to speak with him, and asked him if he had a gun. In my view, that evidence does not support the court's description of Mr. Mayo as fleeing because he knew he was surrounded and trapped by police officers.

As the court notes, *supra* at 6 n.5, there was evidence at the suppression hearing that another unmarked cruiser was driving on a nearby street. There was not

evidence at the suppression hearing, however, that Mr. Mayo perceived that cruiser or even was in a position to do so. The court therefore also relies on trial evidence indicating that (1) the officer who had moved to the side of the other two officers did so in an effort to prevent Mr. Mayo from escaping past that officer; and (2) at the time Mr. Mayo fled, the other unmarked cruiser was parked on a nearby street and could see what was happening in the alley. Even assuming that it is permissible to rely on trial evidence to undermine the trial court's pretrial suppression ruling, the additional trial evidence does not support a conclusion that Mr. Mayo fled because he knew he was surrounded and trapped. To the contrary, for example, the evidence at trial indicated that the officers in the other unmarked cruiser were still inside the cruiser at the other end of the alley when Mr. Mayo started to flee. There appears to be no direct evidence that Mr. Mayo noticed the unmarked cruiser, much less that he somehow inferred that it was occupied by police officers who were surrounding and trapping him.

## B. Provoked or Unprovoked Flight.

The court holds that Mr. Mayo's flight was provoked, rather than unprovoked, and thus "contribute[d] little" to a showing of reasonable suspicion. *Supra* at 27-37. I disagree.

I agree with the court on several points: (1) people sometimes flee from the police for reasons other than consciousness of guilt; (2) the degree to which flight contributes to reasonable suspicion depends on context; (3) the nature of the police actions before the suspect's flight are part of that context; (4) the relevant context includes circumstances such as whether the police have singled the suspect out or asked explicitly or implicitly accusatory questions; and (5) "provocation" or lack thereof is a matter of degree. *Supra* at 27-37. Together, those points persuade me that the flight in this case contributed somewhat less to reasonable suspicion than the flight in *Wardlow*, where the suspect fled at the mere sight of the police. 528 U.S. at 121.

My reasoning differs from that of the court, however, in several significant ways. First, as I have already explained, I do not believe that the evidence in this case supports the court's description of Mr. Mayo as having fled because he understood himself to be surrounded and trapped by the police. Strictly speaking, the precise question is whether the officers in this case should reasonably have understood, in assessing the degree to which Mr. Mayo's flight was suspicious, that Mr. Mayo would have thought he was surrounded and trapped by the police. Essentially for the reasons already given, I believe that, viewing the evidence in the light most favorable to the trial court's ruling, the answer to that question is negative.

Second, Mr. Mayo's flight probably was "provoked" by the police in the broadest sense of that term. Mr. Mayo presumably would not have started running if the police had not pulled into the alley, gotten out of their car, approached him, and asked him a question. But the Supreme Court described the flight in *Wardlow* as "unprovoked," 528 U.S. at 124, even though Mr. Wardlow presumably would not have fled if the police cars had not driven into the area. In fact, in cases such as *Wardlow* and this case, the suspect's flight is viewed as potentially suspicious precisely because that flight appears to have been prompted by the suspect's awareness that the police were present. *Wardlow*, 528 U.S. at 124. In other words, the Supreme Court necessarily understands "provoked" to mean something more than simply "caused by."

Third, to the extent that the court in this case views Mr. Mayo's flight as "provoked" in a sense that caused the flight to contribute "little" to reasonable suspicion, I do not agree. A number of courts have reached a contrary conclusion in circumstances comparable to those of the present case. *See, e.g., United States v. Wilson*, 963 F.3d 701, 702, 704 (7th Cir. 2020) (describing flight as unprovoked, where officers approached group including Mr. Wilson; one officer stood behind Mr. Wilson and another officer stood in front of Mr. Wilson; officer in front asked Mr. Wilson to stand up; and Mr. Wilson fled); *United States v. Jeter*, 721 F.3d 746,

753-55 (6th Cir. 2013) (Mr. Jeter's flight was not provoked so as to undermine basis for investigative detention, where helicopter and several police cruisers converged on group in parking lot; one cruiser approached Mr. Jeter and officer inside asked to speak with him; Mr. Jeter did not respond and started moving away; cruiser blocked Mr. Jeter's path; officer got out of cruiser; and Mr. Jeter fled); *United States v. Ward*, 482 F. App'x 771, 772-73 (4th Cir. 2012) (per curiam) (Mr. Ward fled after officers pulled up beside him and asked him if he had gun; court describes flight as "unprovoked"); *In re D.M.*, 781 A.2d 1161, 1162, 1164-65 (Pa. 2001) (D.M. fled after officer got out of car and told D.M. to come over; court rejects argument that flight was "precipitated by unjust police conduct"); *State v. Law*, 112 So. 3d 611, 612-14 (Fla. Dist. Ct. App. 2013) (per curiam) (Mr. Law's flight not provoked where officer said, "Hey, police, come here, man what are you doing?"; Mr. Law said everything was fine; officer approached; and Mr. Law fled); *United States v. Velez*, No. CR 15-00102, 2015 WL 3465738, at *1, 3 (N.D. Cal. June 1, 2015) (court concludes that Mr. Velez's flight "was unprovoked within the meaning of . . . *Wardlow*," where officers drove next to Mr. Velez, officer shined flashlight on Mr. Velez and said "police," Mr. Velez looked at officers' vehicle but did not otherwise respond and kept walking, officer got out and walked toward Mr. Velez, officer repeatedly identified himself as police officer, officer ordered Mr. Velez to stop, and Mr. Velez fled;), *aff'd*, 671 F. App'x 620 (9th Cir. 2016) (mem. op.); *see*

*also United States v. Lawson*, 233 F. App'x 367, 370 (5th Cir. 2007) ("An attempt to initiate a consensual encounter on the street does not constitute provocation . . . .").

Fourth, the court relies on our decisions in *Miles*, 181 A.3d at 643-45; *Golden v. United States*, 248 A.3d 925 (D.C. 2021); and *Dozier v. United States*, 220 A.3d 933 (D.C. 2019). *Supra* at 33-37. I do not view those decisions as supporting a conclusion that Mr. Mayo's flight in this case added little to reasonable suspicion. In *Miles*, the court did conclude that the suspect's flight was "not unprovoked to the same extent as the defendant's flight in *Wardlow*." 181 A.3d at 645 (internal quotation marks omitted). As I have acknowledged, I think the same can be said of Mr. Mayo's flight in this case. We did not say in *Miles*, however, that Mr. Miles's flight contributed little to reasonable suspicion. *Id.* at 640-45. Moreover, the police conduct in *Miles* was substantially more provocative than the police conduct in the present case. According to the court's opinion in *Miles*, Mr. Miles fled after one officer followed him on foot; another officer drove up onto the sidewalk in front of him, blocking his path; and then the latter officer got out of his vehicle and told Mr. Miles to stop. *Id.* at 643-44.

*Golden* and *Dozier* did not involve the issue of the degree of suspicion attributable to flight, and in each of those cases the police conduct at issue was substantially more coercive than the officers' actions in the present case. *See Golden*, 248 A.3d at 931-32, 938 (officer pulled up to curb directly in front of Mr. Golden, who was walking alone at night; another officer pulled up to curb in perpendicular manner; officer asked Mr. Golden if he had weapons; after Mr. Golden said no, officer persisted, asking Mr. Golden to show his waistband; after Mr. Golden pulled up his shirt, officer continued to persist, walking towards Mr. Golden and twice saying that he could not see Mr. Golden's waistband; and officer then frisked Mr. Golden); *Dozier*, 211 A.3d at 937-38, 941-47 (four officers in marked cruiser drove into secluded alley at night and asked to talk to Mr. Dozier, who was alone at that point; Mr. Dozier did not respond and kept walking; two officers got closer and asked again to speak with Mr. Dozier; officers were stationed so as to "substantially reduce" Mr. Dozier's freedom of movement in alley; after Mr. Dozier agreed to talk, officer asked if Mr. Dozier had any illegal weapons; Mr. Dozier said no; officer persisted, asking if he could pat Mr. Dozier down; and although Mr. Dozier said yes, court held that Mr. Dozier had been unlawfully seized before alleged consent to pat-down).

Finally, I take the court's point that there are innocent reasons for fleeing from the police, including concerns about the possibility of improper police conduct, particularly "in a highly policed community of color." *Supra* at 29. The Supreme Court, however, has given substantial weight to flight from the police notwithstanding flight's acknowledged ambiguity. *Wardlow*, 528 U.S. at 125. I believe that we are obliged to do the same in the circumstances of this case.

## C. High-Crime-Area Evidence.

The court holds that the officers' testimony that the Kenilworth neighborhood was a high-crime area did not meaningfully contribute to reasonable suspicion. *Supra* at 38-46. I respectfully disagree.

I agree with the court on a number of points: (1) evidence that a stop occurred in a high-crime area is not by itself close to sufficient to support reasonable suspicion; (2) more specific and concrete evidence about prior criminal activity in the area of a stop will contribute more substantially to reasonable suspicion, and more general and abstract high-crime-area evidence will contribute less substantially; (3) high-crime-area evidence is often presented in generalized and/or conclusory fashion; (4) placing undue weight on high-crime-area evidence can raise

important concerns of fairness; and (5) in at least some of our cases, the parties do not seem to have disputed the degree of contribution to reasonable suspicion made by high-crime-area evidence. *Supra* at 38-42. I disagree with the court's reasoning, however, in several significant respects.

First, I have a different view of the trial court's ultimate ruling on this issue. The trial court initially indicated that it was unpersuaded that the stop in this case occurred in a high-crime area. On reconsideration, the trial court was equivocal about referring to the area of the stop as a "high-crime area." The trial court, however, (1) backed away from its prior statement that the evidence did not show a high-crime area; (2) accepted Sergeant Jaquez's testimony that the GRU had recovered ten guns from the Kenilworth neighborhood, which was a relatively high number; (3) concluded that Sergeant Jaquez's testimony related to the "particular neighborhood" of the stop; and (4) concluded that Sergeant Jaquez's testimony on that point sufficed to give Sergeant Jaquez heightened concern.

The court's opinion suggests that the trial court misunderstood applicable law and was erroneously relying on Sergeant Jaquez's "subjective assessment of the situation." *Supra* at 44 n.29. In my view, however, the trial court was correctly assessing the objective reasonableness of the stop based on the information Sergeant

Jaquez had about the neighborhood. *See generally, e.g.*, *United States v. Watson*, 697 A.2d 36, 39 (D.C. 1997) ("The reasonableness of a search or seizure must be judged against an objective standard, that is, whether the facts available to the police officer at the moment of seizure warrant a [person] of reasonable caution in the belief that the seizure was reasonable.") (internal quotation marks omitted).

Second, the court announces a rigid new rule:  to make a "meaningful" contribution to reasonable suspicion, high-crime-area evidence must be "sufficiently particularized and objectively substantiated." *Supra* at 38.  I do not believe that the court is free to adopt that rigid rule.  As the court essentially acknowledges, *supra* at 40-41 & n.26 (citing cases), this court has in many cases given meaningful weight to high-crime-area evidence that would flunk the court's new rule.  The court implies, without expressly stating, that our prior cases on this issue are not binding precedent, because the parties in those cases do not appear to have disputed the weight to be given to the high-crime-area evidence at issue.  *Supra* at 40-41.  The court's implication raises an interesting question of stare decisis:  to what extent are subsequent divisions of this court free to disregard legal conclusions relied upon in prior decisions of the court, on the ground that the prior decisions do not make clear whether the parties were disputing those legal conclusions?  I see no need to delve

into that question, however, because in my view the rule adopted by the court in this case is foreclosed by the Supreme Court's decision in *Wardlow*.

The Supreme Court in *Wardlow* gave substantial weight to the evidence that stop in that case occurred in a "high crime area." 528 U.S. at 124. In fact, the Supreme Court's holding that the officers had reasonable suspicion rested entirely on the high-crime-area evidence and Mr. Wardlow's unprovoked flight from police officers. *Id.* at 123-26.

The parties in *Wardlow* disputed whether the stop in fact was located within a high-crime-area, or whether instead the officers stopped Mr. Wardlow while they were on the way to a high-crime area. The Supreme Court apparently agreed with the government on that issue, describing the stop as having occurred in "an area known for heavy narcotics trafficking." 528 U.S. at 121. The Court did not, however, suggest that the high-crime-area evidence was "particularized" in any way beyond the word "area." *Id.* The concurring/dissenting opinion criticized the Court on that point, stating that "it would be a different case if the officers had credible information respecting that specific street address which reasonably led them to believe that criminal activity was afoot in that narrowly defined area." *Id.* at 138 & n.16 (Stevens, J., concurring in part and dissenting in part).

It is not entirely clear what the court in this case means by its requirement that high-crime-area be objectively substantiated. Whatever the court means, however, the requirement appears to be inconsistent with *Wardlow*. The high-crime-area-evidence in *Wardlow* apparently consisted of one officer's unelaborated testimony that the area was "high narcotics traffic" and that in such areas there usually are a lot of people, including "sometimes" lookouts and customers. Joint Appendix, *Illinois v. Wardlow*, 528 U.S. 119 (2000) (No. 98-1036), 1999 WL 33612745, at *8a. In an argument that is strikingly similar to the holding of the court in the present case, Mr. Wardlow argued to the Supreme Court that "[t]he police presented no evidence of quantitative verification that identified the precise location or boundaries of the area known by the officers to have a high incidence of narcotics trafficking." Brief for Respondent, *Wardlow*, 528 U.S. 119 (No. 98-1036), 1999 WL 607000, at *32. The Supreme Court was not persuaded by that argument, however, because it nevertheless gave substantial weight to the high-crime-area evidence in *Wardlow*.

In sum, the high-crime-area evidence in *Wardlow* would flunk the rule the court adopts in this case. I therefore conclude that the court lacks authority to adopt that rule. The court cites no case adopting such a rule. To the contrary, a number of courts have declined to impose the requirements the court adopts in this case. *See, e.g.*, *United States v. Weaver*, 9 F.4th 129, 151 n.86 (2d Cir. 2021) (en banc) (on

question whether stop occurred in high-crime area, "First-hand knowledge of police officers who regularly patrol the relevant area is one logical source of evidence. Statistical data may likewise be offered—by the prosecution or the defense—but it is certainly not required.") (citation omitted); *United States v. Guardado*, 699 F.3d 1220, 1223 (10th Cir. 2012) ("[Mr. Guardado] argues that the term 'high-crime area' is dangerously vague because 'there is not an objective method for determining if the officer's assertion is true.' Whatever merit there is to Mr. Guardado's argument, the Supreme Court—and accordingly, this circuit—continues to consider an area's disposition toward criminal activity as a factor that contributes to an officer's reasonable suspicion.") (citation omitted); *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) ("[Mr.] Baskin contends that the government must produce 'specific data' establishing that a location is a 'high-crime area' for this inference of criminality to be drawn from the defendant's flight. He, however, identifies no decisions by this court in support of that proposition."); *cf. State v. Genous*, 961 N.W.2d 41, 44 n.4 (Wis. 2021) (rejecting argument that court "should employ [its] supervisory authority to create evidentiary prerequisites for circuit courts considering" whether stop occurred in high-crime area).

In addition to conflicting with *Wardlow*, the heightened proof requirement adopted by the court in this case is contrary to the Supreme Court's more general

holding that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984) (internal quotation marks omitted).

For the foregoing reasons, I believe that the court is required by controlling precedent to give substantial weight in the reasonable-suspicion analysis to Sergeant Jaquez's credited testimony that the GRU had recovered a relatively high number of guns from the particular neighborhood in which the stop occurred.

## D. Totality of the Circumstances.

I have already explained why in my view the totality of the circumstances gave rise to reasonable suspicion. I briefly address a recurring issue in this area of the law: whether the Supreme Court held in *Wardlow* that unprovoked flight from police officers in a high-crime area sufficed to establish reasonable suspicion.

This court addressed that issue in *Wilson*, 802 A.2d at 370-71, holding that *Wardlow* "held that the defendant's unprovoked flight upon noticing the police, combined with his presence in an area of heavy narcotics trafficking," sufficed to support an investigative detention. *Id.* at 370; *see also id.* at 371 (*Wardlow* rejected

conclusion "that unprovoked flight in a high crime area is insufficient to constitute reasonable suspicion"). We specifically addressed the suggestion that the Supreme Court's holding in *Wardlow* also rested on the fact that Mr. Wardlow had been holding an opaque bag. *Id.* We concluded that the opaque bag "played no part in the Court's reasoning" in *Wardlow*. *Id.*

In a series of later cases, however, we have interpreted *Wardlow* differently. The first of those cases is *Gordon v. United States*, 120 A.3d 73, 84 (D.C. 2015) (interpreting *Wardlow*'s holding of reasonable suspicion to rest in part on Mr. Wardlow's possession of opaque bag). I was a member of the division in *Gordon*, but I have come to believe that *Gordon* is incorrect on this point. More importantly, *Gordon* is contrary to our prior controlling opinion in *Wilson*, which the court did not mention in *Gordon*. Under the circumstances, we are required to follow *Wilson* rather than *Gordon*. *Gan*, 224 A.3d at 1210. The court has followed *Gordon* in at least one subsequent case, without acknowledging the conflict between *Gordon* and *Wilson*. *See Miles*, 181 A.3d at 640; *id.* at 648 n.21 (McLeese, J., dissenting). Similarly, in *Posey v. United States*, 201 A.3d 1198, 1203 (D.C. 2019), the court rejected the argument "that Mr. Posey's presence in a high crime neighborhood coupled with his [unprovoked] flight from uniformed officers" sufficed to establish reasonable suspicion, stating that "[w]e harbor no doubt that more is required for

officers to develop reasonable articulable suspicion of criminal activity justifying a stop." *Id.* In *Posey* too the court did not address the conflict between its holding and the court's prior contrary holding in *Wilson*. *Id.* In my view, this court is required to follow *Wilson* rather than contrary later decisions.

As a final note, I am puzzled by the court's suggestions in this case that Mr. Wardlow's mere possession of an opaque bag contributed materially to the grounds for reasonable suspicion in *Wardlow*. *Supra* at 31, 39 n.25. If Mr. Mayo's hand motions near his waistband are too ambiguous to meaningfully contribute to reasonable suspicion in this case, *see supra* at 23-27, then it would seem that the same must be true of Mr. Wardlow's possession of an opaque bag in *Wardlow*.

## V.

Because I would uphold the trial court's suppression ruling on the ground that the officers had reasonable suspicion to stop Mr. Mayo, I would not need to reach the exclusionary-rule issues addressed by the court. *See supra* at 47-56. I do make one observation, however. The United States argues, among other things, that Mr. Mayo's actions in divesting himself of the contraband after he fled were not caused by the seizure of Mr. Mayo, because (1) Mr. Mayo started running before the police

seized him; and (2) it can be inferred that, even before he was seized, Mr. Mayo had intended to divest himself of the contraband. The court rules against that argument, describing the suggested inference as "illogical." *Supra* at 51. It is not clear to me why the court views that inference as illogical. In any event, it is not the job of an appellate court to decide in the first instance whether or not to accept that inference. "But for" causation, also called causation in fact, is -- as its labels imply -- a question of fact. *See, e.g.*, *Grand Canyon Tr. v. Bernhardt*, 947 F.3d 94, 96 (D.C. Cir. 2020) ("[A]ctual causation is as much a question of fact in the FOIA context as it is in any other . . . .") (per curiam); *Sponaugle v. Pre-Term, Inc.*, 411 A.2d 366, 369 n.7 (D.C. 1980) (equating "but for" causation and "causation in fact"). Because it had no occasion to address the exclusionary rule, the trial court made no finding as to whether Mr. Mayo decided to divest himself of the contraband before or after he was tripped. This court should not decide that factual question. "It is incumbent upon us, in this case as in any other, to eschew appellate fact-finding, and to avoid usurping the function of the trial court." *In re K.C.*, 200 A.3d 1216, 1233 n.9 (D.C. 2019) (internal quotation marks omitted).

Because I would affirm the trial court's holding that the police had reasonable suspicion to stop Mr. Mayo, I would not need to address Mr. Mayo's other arguments. I see no reason to address at any length in this dissent arguments that

the court does not reach and that are not relevant to further disposition of this case. Suffice it to say that I do not view those arguments as providing a basis for reversal. I therefore would have affirmed Mr. Mayo's convictions. I respectfully dissent from the court's contrary ruling.